IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

SEP 3 0 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. B-02-168 |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S MOTION TO DISMISS**
**AND BRIEF IN SUPPORT**

Pursuant to the prior Order of United States District Judge Hilda G. Tagle and to the Federal Arbitration Act ("FAA"), *9 U.S.C. §§ 1 et seq.*, Defendant AFC Enterprises, Inc. ("AFC") moves to dismiss this action to permit an arbitration to proceed in accordance with the parties' written arbitration agreement or, in the alternative, to affirmatively compel Plaintiff to participate in an arbitration proceeding between the parties.

**I. SUMMARY OF MOTION**

1.      Plaintiff sued AFC in state district court in Willacy County on December 3, 2001. AFC removed the case to this Court, where it was assigned civil action no. B-01-214, and AFC moved to dismiss the case pursuant to a valid arbitration agreement between the parties. Plaintiff moved to remand the case. Judge Hilda G. Tagle denied Plaintiff's motion to remand and dismissed the case to allow Plaintiff to pursue his claims in arbitration. Plaintiff did not initiate arbitration, but instead filed the same claims in the same court in Willacy County again, forcing AFC to remove Plaintiff's claims to this Court again, and again to move to dismiss Plaintiff's claims to allow Plaintiff to proceed to arbitration as originally ordered by Judge Tagle.

## II. BACKGROUND FACTS

2.       On December 3, 2001, AFC, which operates Churchs Chicken restaurants, was
served with a copy of the Plaintiff's Original Petition (attached to Defendant's Notice of
Removal, attached hereto as Exhibit 1), filed on November 27, 2001 in the 138th Judicial District
Court of Willacy County, Texas, Cause No. 01-359, styled *Jesus Ramirez, Plaintiff v. AFC
Enterprises, Inc., Defendant.*  AFC removed the case to this court on December 31, 2001, where
it was assigned Civil Action No. B-01-214 ("Civil Action B-01-214").  *Defendant's Notice of
Removal, attached hereto as Exhibit 1.*

3.       When AFC removed Plaintiff's case, AFC also filed Defendant's Motion to
Dismiss and Brief in Support ("Motion to Dismiss").  *Attached hereto as Exhibit 2.*  AFC moved
to dismiss Plaintiff's claims in Civil Action B-01-214 because all of Plaintiff's claims were
subject to a valid arbitration agreement signed by the Plaintiff, Jesus Ramirez.  *Id.*

4.       In response, Plaintiff only filed Plaintiff's Motion to Remand on January 28,
2002, to remand Civil Action B-01-214 back to state court in Willacy County.  In response, AFC
filed Defendant's Response to Plaintiff's Motion to Remand on February 14, 2002.  On May 7,
2002, the judge presiding over Civil Action B-01-214, Judge Hilda G. Tagle, denied Plaintiff's
Motion to Remand.

5.       Meanwhile, attorney Ricardo A. Garcia filed a Notice of Appearance in Civil
Action B-01-214 designating himself as Attorney in Charge on behalf of Plaintiff in Civil Action
B-01-214.

6.       At the subsequent Management Conference before the Court on May 13, 2002,
Judge Tagle heard arguments regarding Defendant's Motion to Dismiss Civil Action B-01-214
and issued an Order granting Defendant's Motion to Dismiss.  *Order, attached hereto as Exhibit*

3.   The only authority under which AFC had sought dismissal was pursuant to the Federal Arbitration Act ("FAA") and Fifth Circuit precedent that allowed for dismissal of a civil action if all claims are subject to a valid arbitration agreement.   *Motion to Dismiss at 1, 7 n.3.*   In other words, Judge Tagle dismissed Civil Action B-01-214 so that it could proceed to arbitration pursuant to the valid arbitration agreement between the parties.

7.      Nonetheless, on July 25, 2002, Plaintiff filed the exact same Plaintiffs' Original Petition ("Plaintiff's Second Petition") again in the same state court, the 138th Judicial District Court of Willacy County, Texas, where it was assigned Cause No. 02-183 ("Plaintiff's Second State Action").   Plaintiff's attorney who filed Plaintiff's Second Petition, Ricardo A. Garcia, was the same attorney designated as Plaintiff's Attorney in Charge in Civil Action B-01-214 at the time it was dismissed by Judge Tagle on May 13, 2002.   Plaintiff's Second Petition was served on AFC on August 6, 2002.

8.      Plaintiff's Second Petition alleged the exact same claims and facts as Plaintiff's Original Petition.   *Compare, Plaintiff's Second Petition, attached to Defendant's Notice of Removal in this civil action, with Plaintiff's Original Petition, attached to Defendant' Notice of Removal in Civil Action B-01-214, attached hereto as Exhibit 1.*   Plaintiff again alleged that he was injured in the scope of his employment with AFC on August 22, 2000 at AFC's Churchs Chicken restaurant in Raymondville, Willacy County, Texas.   *Plaintiff's Second Petition at ¶ 4.1.*

9.      AFC removed Plaintiff's Second State Action to this Court on August 30, 2002, where it was assigned its current civil action number.   *Defendant's Notice of Removal, on file herein.*

10.     AFC now again moves to dismiss Plaintiff's claims because they are still subject to the same valid arbitration agreement, and Plaintiff directly contradicted the Order of Judge

Tagle dismissing Civil Action B-01-214 so these same claims could be pursued in arbitration. Instead, Plaintiff filed this same action again in state court.

### III.  ARGUMENT AND AUTHORITIES

10.    Since AFC has already moved to dismiss Plaintiff's same claims in Civil Action B-01-214, AFC incorporates by reference for all purposes its entire Motion to Dismiss from Civil Action B-01-214, which is attached hereto as Exhibit 2.  AFC also incorporates by reference for all purposes Judge Tagle's Order dated May 13, 2002, attached hereto as Exhibit 3, granting AFC's Motion to Dismiss.  AFC now again moves to dismiss this civil action on the same grounds as asserted in the Motion to Dismiss filed in Civil Action B-01-214.  Moreover, AFC would submit that Judge Tagle's May 13, 2002 Order essentially establishes the law of the case, and that this Court is bound by Judge Tagle's prior decision to dismiss this case.

WHEREFORE, Defendant requests that the Court follow Judge Tagle's previous Order dismissing Plaintiff's same claims in Civil Action B-01-214, and again dismiss this lawsuit to allow Plaintiff to pursue arbitration before the American Arbitration Association in accordance with the terms of the parties' Value Deal Agreement or, in the alternative, stay this litigation pending arbitration of Plaintiff's claims pursuant to the Value Deal Agreement, and such other and further relief, either at law or in equity, to which AFC is entitled.

Respectfully submitted,

Douglas C. Bracken
Texas Bar No. 00783697
S. D. Bar No. 22646
Gary D. Sarles
Texas Bar No. 17651100
S. D. Bar No. 19735

SARLES & OUIMET, L.L.P.
370 Founders Square
900 Jackson Street
Dallas, Texas  75202-4436
Telephone:  (214) 573-6300
Telecopier:  (214) 573-6306
**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this *25th* day of September 2002, a true and correct copy of this Defendant's Motion to Dismiss and Brief in Support was forwarded via first class mail to Plaintiff's counsel of record, Ricardo A. Garcia, 820 South Main Street, McAllen, Texas 78501.

Douglas C. Bracken

- 5 -



IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

DEC 3 1 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **B -01- 214** |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441 & 1446, Defendant AFC Enterprises, Inc. ("AFC")

files this Notice of Removal to this Court of the civil action filed against it by Plaintiff Jesus

Ramirez, and on the basis of the following facts that show this case is removable to this Court:

1.        On December 3, 2001, AFC, which operates Churchs Chicken restaurants, was

served with a copy of the Plaintiff's Original Petition filed on November 27, 2001 in the 138th

Judicial District Court of Willacy County, Texas (the "State Court"), Cause No. 01-359, styled

*Jesus Ramirez, Plaintiff v. AFC Enterprises, Inc., Defendant.*

2.        AFC is a nonsubscriber to the Texas Workers' Compensation Act. Plaintiff's

Original Petition alleges that Plaintiff, a resident of Willacy County, Texas, was injured on or

about August 22, 2000 while employed by AFC as an employee at one of its Churchs Chicken

restaurants. *Plaintiff's Original Petition at ¶¶ 1.1, 4.1.* Plaintiff further alleges that he

"sustained serious and debilitating injuries to his left shoulder area" and "has endured a

substantial amount of pain due to a torn rotar [sic] cuff in his shoulder." *Id. at ¶¶4.1, 6.1.* He is

seeking damages for pain and mental anguish in the past and future, physical impairment in the

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1332, 1441 & 1446, Defendant AFC Enterprises, Inc. ("AFC")

files this Notice of Removal to this Court of the civil action filed against it by Plaintiff Jesus

Ramirez, and on the basis of the following facts that show this case is removable to this Court:

1.     On December 3, 2001, AFC, which operates Churchs Chicken restaurants, was

served with a copy of the Plaintiff's Original Petition filed on November 27, 2001 in the 138th

Judicial District Court of Willacy County, Texas (the "State Court"), Cause No. 01-359, styled

*Jesus Ramirez, Plaintiff v. AFC Enterprises, Inc., Defendant.*

2.     AFC is a nonsubscriber to the Texas Workers' Compensation Act.  Plaintiff's

Original Petition alleges that Plaintiff, a resident of Willacy County, Texas, was injured on or

about August 22, 2000 while employed by AFC as an employee at one of its Churchs Chicken

restaurants.  *Plaintiff's Original Petition at ¶¶ 1.1, 4.1.*  Plaintiff further alleges that he

"sustained serious and debilitating injuries to his left shoulder area" and "has endured a

substantial amount of pain due to a torn rotar [sic] cuff in his shoulder." *Id. at ¶¶ 4.1, 6.1.* He is

seeking damages for pain and mental anguish in the past and future, physical impairment in the

past and future, medical expenses in the past and future, loss of wages in the past and loss of future wage-earning capacity. *Id. at ¶6.1.*

3. This Court has original jurisdiction over this civil action because the amount in controversy exceeds the sum or value of $75,000 and is between citizens of different States. *28 U.S.C. § 1332(a)(1).* Plaintiff is a citizen of the State of Texas. *Plaintiff's Original Petition at ¶1.1.* Defendant AFC is a Minnesota corporation with its principal place of business in Atlanta, Georgia. *Id. at ¶ 1.2.* Although Plaintiff "pleads" for damages less than $75,000, *Id. at ¶ 6.3,* the amount in controversy, exclusive of interest and costs, clearly exceeds the sum or value of $75,000. *See Affidavit of Gary D. Sarles, attached hereto as Exhibit "A," and Exhibit attached thereto.*

4. The time within which Defendant is required by 28 U.S.C. § 1446(b) to file this Notice of Removal has not yet expired, and the only Defendant, AFC, has joined in this removal.

5. In accordance with 28 U.S.C. § 1446(a) and Local Rule 81, attached to this Notice of Removal is: (1) a copy of all executed process in the case; (2) all pleadings asserting causes of action in the State Court; (3) all orders signed by the state judge (none); (4) a copy of the docket sheet; (5) an index of matters being filed; and (6) a list of all counsel of record, including addresses, telephone numbers, and parties represented. A copy of this Notice of Removal is also being filed with the State Court.

WHEREFORE, Defendant prays that this Court take jurisdiction of this action to its conclusion and to final judgment to the exclusion of any further proceeding in the State Court.

Respectfully submitted,

Gary D. Sarles
Attorney-in-charge
State Bar No. 17651100
Douglas C. Bracken
State Bar No. 00783697

**SARLES & OUIMET, L.L.P.**
370 Founders Square
900 Jackson Street
Dallas, Texas 75202-4436
Telephone: (214) 573-6300
Telecopier: (214) 573-6306

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this _28th_ day of December 2001, a true and correct copy of Defendant's Notice of Removal was forwarded via first class mail to Plaintiff's attorney of record, Aaron I. Vela, 600 South Closner, Edinburg Texas 78539.

Douglas C. Bracken

- 3 -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No._____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## INDEX OF MATTERS BEING FILED

1.    Citation

2.    Plaintiff's Original Petition

3.    Defendant's Original Answer

4.    Civil Docket Sheet

5.    List of Counsel of Record

6.    Affidavit of Gary D. Sarles

7.    Civil Cover Sheet

15-2108—CITATION PERSONAL SERVICE—DISTRICT OR COUNTY COURT (Revised 2000 2-7-459 J.)   Hart InterCivic

# CITATION

THE STATE OF TEXAS

To   AFK Enterprises, Inn., Registered Agent of Process: Prentice-Hall Corporation

800 Brazos,

Austin, TX 78701

Defendant_____, in the hereinafter styled and numbered cause: 01-359

YOU ARE HEREBY COMMANDED to appear before the _____138th_____ Court _____

of _____Willacy_____ County, Texas, to be held at the courthouse of said county in the City of

_____Raymondville_____ , _____Willacy_____ County, Texas, by filing a written answer to the

petition of plaintiff ___ at or before 10 o'clock A.M. of the Monday next after the expiration of 20 days after the date of service hereof,

a copy of which accompanies this citation, in cause number _____01-359_____ , styled

_____

Jesus Ramirez _____, Plaintiff____,

vs.   AFC Enterprises, Inc. _____, Defendant____,

filed in said court on the   27th day of November , 2001.

Plaintiff is represented by   Aaron I. Bela _____, whose

address is   600 South Closner   Edinburg,   Texas   78539

street        city        state        zip code

ISSUED AND GIVEN UNDER MY HAND AND SEAL of said Court at office, this the _____27th_____ day of

November , 20 01

S.V. "Chago" Fonseca

District Clerk of   Willacy   County, Texas

546 W. Hidalgo, 2nd Floor

Clerk's address

Raymondville, TX 78580

By _____ Deputy.

---

SENDER: COMPLETE THIS SECTION
■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

COMPLETE THIS SECTION ON DELIVERY
A. Received by (Please Print Clearly)   B. Date of Delivery 3 DEC 2001
C. Signature  X   □ Agent □ Addressee
D. Is delivery address different from item 1?  □ Yes   If YES, enter delivery address below: □ No

D MAIL RECEIPT
Mail Only; No Insurance Coverage Provided)

1. Article Addressed to:
AFC ENTERPRISES, INC.
Registered Agent of Process:
PRENTICE-HALL CORPORATION
800 Brazos
tin, TX 7870

DEC 0 5 2001

3. Service Type
□ Certified Mail □ Express Mail
□ Registered □ Return Receipt for Merchandise
□ Insured Mail □ C.O.D.
4. Restricted Delivery? (Extra Fee)   □ Yes

2. Article Number (Copy from service label)

PS Form 3811, July 1999   Domestic Return Receipt   102595-00-M-0952

CAUSE NO. 01-359

| | | |
|---|---|---|
| JESUS RAMIREZ | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| vs. | § | 138th JUDICIAL DISTRICT |
| | § | |
| AFC ENTERPRISES, INC, | § | |
| Defendant | § | WILLACY COUNTY, TEXAS |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES JESUS RAMIREZ, Plaintiff, in the above entitled and numbered cause,

complaining of **AFC ENTERPRISES, INC.**, Defendant,  and for  cause of  action, would

respectfully show the Court:

I.

### PARTIES

1.1    Plaintiff is an individual and residents of Willacy County, Texas.

1.2    Defendant, **AFC ENTERPRISES, INC.** is a corporation whose main office is in Atlanta

Georgia, and whose Registered Agent for Service of Process is Prentice-Hall Corporation may be

served with citation by *Certified Mail, Return Receipt Requested* at their place of business  located

at 800 Brazos, Austin, Texas 78701.  Issuance of citation is requested at this time.

II.

### VENUE

2.1    Venue and jurisdiction is proper in Willacy County, Texas because all or a substantial part of

the events  at the center of this lawsuit occurred in Willacy County.



Page 1

III.

## DISCOVERY LEVEL

3.1     Pursuant to Rule 190.3 of the Texas Rules of Civil Procedure, discovery in this case will be

conducted under Level 3.

IV.

## FACTS

4.1     On or about August 22, 2000, while Plaintiff, **JESUS RAMIREZ**, was in the course and

scope of employment at the Churches Fried Chicken in Raymondville, Willacy County, Texas.

Plaintiff, **JESUS RAMIREZ**, while performing his duties at his place of employment, was ordered

by his immediate supervisor, Eddie Orosco, to assist him in moving a stove from one area of the

premises to another.  Plaintiff, **JESUS RAMIREZ**, at the direction of Mr. Orosco, began to assist

him and shortly thereafter had to stop because a pain in his left shoulder area.  Since that date,

Plaintiff, **JESUS RAMIREZ**, has endured a substantial amount of pain due to a torn rotar cuff in his

shoulder.

V.

## NEGLIGENCE

5.1     Plaintiffs' suffered injuries that were proximately caused by Defendant's negligent actions

and/or omissions, which consist of, but are not limited to the following:

    1)     Defendants failed to keep a proper lookout for the Plaintiffs' safety that would have
        been maintained by a person under the same or similar circumstances using ordinary
        care;

    2)     Defendants failed to take evasive action to avoid the incident which occurred to the
        Plaintiff as a person using an ordinary care would have under the same or similar
        circumstances; and

5.2     Each of the aforementioned acts or omissions of Defendants were the proximate cause of the

negligence and of the resulting damages and injuries to Plaintiff.

## VI.

## DAMAGES

6.1     As a direct and proximate result of the incident made the basis of this lawsuit, Plaintiff JESUS

RAMIREZ sustained serious and debilitating injuries to his left shoulder area.  Plaintiff suffered the

following damages as a result of the negligence of Defendants:

      a.      Physical pain and mental anguish in the past and future;

      b.      Physical impairment in the past and future;

      c.      Medical expenses in the past;

      d.      Medical expenses in the future;

      e.      Loss of wages in the past; and

      f.      Loss of future wage-earning capacity.

6.2     All of the above damages were proximately caused by the negligent actions and/or omissions

of Defendant.

6.3     Plaintiff affirmatively pleads for damages less than $75,000.00.

**WHEREFORE PREMISES CONSIDERED,** Plaintiff pray that the Defendants be cited

to appear and answer herein, and that upon final hearing Plaintiff have judgment within the

jurisdictional limits of this Court, as follows:

      1)      Judgment against defendant for its damages as set forth above, in an amount within
the jurisdictional limits of the Court;

      2)      Prejudgment and postjudgment interest as provided by law;

      3)      All costs of suit; and

4)    For such other and further relief to which Plaintiff may be justly entitled to receive.

                                          Respectfully submitted,

                                            **LAW OFFICE OF AARON I. VELA**
                                            600 South Closner
                                            Edinburg, Texas 78539
                                            Telephone (956) 381-4440
                                            Facsimile (956) 381-4445

                                            By:_____
                                                Aaron I. Vela
                                              State Bar No. 00797598

                                            **ATTORNEY FOR PLAINTIFF**



No. 01-359

| | | |
|---|---|---|
| JESUS REMIREZ, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 138TH JUDICIAL DISTRICT |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | WILLACY COUNTY, TEXAS |

<u>DEFENDANT'S ORIGINAL ANSWER</u>

Defendant AFC Enterprises, Inc. files this its Original Answer to Plaintiff's Original Petition and would respectfully show the Court as follows:

<u>GENERAL DENIAL</u>

Defendant denies each and every one of the allegations in Plaintiff's Original Petition and demands that Plaintiff prove those allegations by a preponderance of the evidence.

<u>DEFENSES</u>

1.    Plaintiff's claims, if any, are not properly before this Court, in that Plaintiff's Original Petition was filed in violation and breach of Plaintiff's written agreement, governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, to submit all disputes between him and Defendant to binding arbitration before a neutral arbitrator from the American Arbitration Association.

2.    Defendant asserts that Plaintiff has failed to mitigate his damages, if any.

3.    Defendant is entitled to an offset to any recovery awarded to Plaintiff for all payments made to Plaintiff in the form of wage-replacement benefits and for all medical bills and related expenses paid on his behalf by Defendant.

4.    Further, Defendant would show that Plaintiff's own negligence was the sole cause of the accident and injury alleged by Plaintiff.

WHEREFORE, Defendant prays that this action be dismissed and Plaintiff ordered to submit his claims, if any, to the American Arbitration Association in accordance with his written arbitration agreement with Defendant, that Plaintiff be awarded a take-nothing judgment, that all costs of court be taxed against Plaintiff, and that Defendant be awarded any and all relief to which it is entitled.

Respectfully submitted,

Gary D. Sarles
State Bar No. 17651100
Douglas C. Bracken
State Bar No. 00783697

SARLES & OUIMET, L.L.P.
370 Founders Square
900 Jackson Street
Dallas, Texas 75202-4436
Telephone: (214) 573-6300
Telecopier: (214) 573-6306

——————   **ATTORNEYS FOR DEFENDANT**   ——————

### CERTIFICATE OF SERVICE

I hereby certify that on this  _10th_  day of December, 2001 a true and correct copy of Defendant's Original Answer was forwarded via certified mail, return receipt requested, to Plaintiff's counsel of record, Aaron I. Vela, 600 South Closner, Edinburg Texas 78539.

Douglas C. Bracken

Defendant's Original Answer - Page 2

FROM HART INFORMATION SERVICES, AUSTIN, TX · 800/231-HART ©

In the 138th District Court

| Number of Case | NAMES OF PARTIES | ATTORNEYS | Kind of Action and Party Demanding Jury | DATE OF FILING Month | Day | Year |
|---|---|---|---|---|---|---|
| 01-359 | Jesus Ramirez VS AFC ENTERPRISES INC. | Aaron L. Vela 600 South Closner Edinburg, TX 78539  Pltf. Douglas C. Bracken 370 Founder Square 900 Jackson Street Dallas, TX 75202-4436  Deft. | Negligence | 11 | 27 | 01 |

ORDERS OF COURT

**PROCESS**

Original Petition filed 11-27-01
Citation Issued 11-27-01 AFC ENTERPR
INC.
Defendants Original Answer filed 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS RAMIREZ,                        §
                                      §
        Plaintiff,                    §
                                      §
v.                                    §    Civil Action No. _____
                                      §
AFC ENTERPRISES, INC.,                §
                                      §
        Defendant.                    §

## LIST OF COUNSEL OF RECORD

Aaron I. Vela
Texas Bar No. 00797598
600 South Closner
Edinburg, Texas 78539
Telephone: (956) 381-4440
Telecopier: (956) 381-4445
**Attorney for Plaintiff**
**Jesus Ramirez**


Gary D. Sarles
Attorney in charge
Texas Bar No. 17651100
S.D. Bar No. 19735
Douglas C. Bracken
Texas Bar No. 00783697
S.D. Bar No. 22646
**SARLES & OUIMET, L.L.P.**
370 Founders Square
900 Jackson Street
Dallas, Texas 75202-4436
Telephone: (214) 573-6300
Telecopier: (214) 573-6306
**Attorneys for Defendant**
**AFC Enterprises, Inc.**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF GARY D. SARLES

On this day Gary D. Sarles personally appeared before me, the undersigned notary public, and after first being sworn, testified as follows:

1.     My name is Gary D. Sarles. I am over 21 years of age, have never been convicted of a felony, and am otherwise competent to make this Affidavit. The statements made herein are true and correct and based upon my own personal knowledge.

2.     I am counsel of record in this lawsuit for the Defendant, AFC Enterprises, Inc. ("AFC"). In the course of defending this lawsuit, I obtained documents from the third party administrator of claims for AFC, GAB Robins ("GAB"), from GAB's claim file for Plaintiff, Jesus Ramirez. Attached hereto as Exhibit 1 is a true and correct copy of a Settlement Brochure and cover letter dated June 22, 2001 sent to GAB from the Law Office of Aaron I. Vela, counsel for Mr. Ramirez in this matter. In the Settlement Brochure, Mr. Vela demands $150,000.00 to settle this claim on behalf of his client.

_____
Gary D. Sarles

**EXHIBIT "A"**

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary public, on this

28 th day of December, 2001.                    *Cynthia Perrio*

Notary Public in and for the State of Texas

CYNTHIA PERRIO
Notary Public State of Texas
My Commission Expires 07-30-05

LAW OFFICE OF
# AARON I. VELA
*A Professional Corporation*

1 PASEO DEL PRADO, BLDG. 101
P.O. BOX 4550 (78540)
EDINBURG, TEXAS 78539

PHONE (956) 630.9990
FAX     (956) 630.9472

June 22, 2001

Ms. Teresa Blake
**GAB ROBINS NORTH AMERICA, INC.**
9000 Southwest Freeway, Ste. 400
Houston, Texas 77074-2020

VIA CMRRR #7000 1670 0001 4304 8371
VIA FACSIMILE (713) 270-3835

| Re: | | |
|-----|-----|-----|
| | Date of Injury | August 22, 2000 |
| | Your Insured: | AFC Enterprises, Inc. |
| | Claimant: | Jesus Ramirez |
| | GAB Claim No.: | 45170-14738A |

RECEIVED
JUN 25 2001
GAB HOUSTON

Dear Ms. Blake:

This office was hired to represent Jesus Ramirez to assist him in resolving a claim he has against your insured, arising out of a personal injury to his left shoulder which occurred on or about August 22, 2000.

Enclosed you will find claimant's settlement brochure, which includes all medical records and copies of medical statements totaling to $528.12 regarding the treatment and care of Jesus Ramirez.

I have provided you with sufficient information and documentation for your office to make a decision regarding this matter.

If you should have any questions or require anything else to assist you in your evaluation of this claim, please do not hesitate to contact me and/or my legal assistant, Diana Cerda.

Very truly yours,

*LAW OFFICE OF AARON I. VELA*

By: Aaron I. Vela /dc

Aaron I. Vela

AIV/dc

MR. TERESA BLAKE
GAB ROBINS NORTH AMERICA, INC.
June 22, 2001
Page 2

cc:    Jesus Ramirez
       P.O. Box 1227
       Raymondville, Texas 78580

RECEIVED

JUN 2 5 2001

GAB HOUSTON

# SETTLEMENT BROCHURE

Jesus Ramirez
vs.
AFC Enterprises, Inc./Churches
**Claim No. 45170-14738A**

### Presented to:

Teresa Blake, Adjuster
GAB ROBINS NORTH AMERICA, INC.
9000 Southwest Freeway, Ste. 400
Houston, Texas 77074-2020

**PRESENTED BY:**

Aaron I. Vela
State Bar No. 00797598
**LAW OFFICE OF AARON I. VELA**
1 Paseo del Prado, Bldg. 101
Edinburg, TX 78539
Telephone (956) 630-9990
Facsimile (956) 630-9472

RECEIVED

JUN 2 5 2001

GAB HOUSTON

# I.

## INTRODUCTION

This claim arises out of an incident which occurred on August 22, 2000, while our client was in the course and scope of employment of AFC/Churches at the Churches Chicken fast food restaurant in Raymondville, Willacy County, Texas. On that day, Mr. Ramirez, while performing his duties at his place of employment. was ordered by his immediate supervisor, Eddie Orosco to assist him in moving a stove from one area of the premises to another. While following orders, Mr. Ramirez, at the direction of Mr.Orosco, began to assist him and shortly thereafter had to stop and rest because a pain in his left shoulder area. Since that date, Mr. Ramirez has endured a substantial amount of pain due to a torn rotator cuff in his left shoulder. For the few months following the incident, Mr. Ramirez believed that the shoulder pain would resolve by itself without the necessity of any medical treatment. However, as the pain continued to persist, he sought medical attention on his own, due to the fact that his employer did not provide him with health insurance and/or worker's compensation coverage.

# II.

## MEDICAL RECORDS AND COSTS

Mr. Ramirez visited his family physician Dr. Jesus Sinha as a result of the pain in his left shoulder. On his first visit to Dr. Sinha's office, Mr. Ramirez complained of chronic pain to his left shoulder. He was assessed with left shoulder strain and received a 160 mg injection of DepoMedrol to his left shoulder joint. He returned the next day for a follow up visit with continued left shoulder pain and was prescribed medication for his pain. He returned 2½ weeks later with continued left shoulder pain, wherein he was prescribed medication for pain and was referred to Dr. Bliss Clark, an orthopedic surgeon, because conservative treatment on the left shoulder was not resolving the pain. X-rays were taken at Dr. Sinha's office which were forwarded to Dr. Clark's office.

RECEIVED
JUN 2 5 2001

On April 6, 2001, Mr. Ramirez was seen by Dr. Clark for the pain to his left shoulder. Dr. Clark's report of April 6, 2001 indicates that Dr. Sinha's prescriptions for medication and injections did not resolve Mr. Ramirez' pain. The report further indicates he has a positive impingement sign of his left shoulder with posttraumatic rotator cuff tendonitis. He received an injection on his first visit with Dr. Clark, however, according to the records of April 11, 2001, there was no significant pain or relief as a result of the injection. Dr. Clark prescribed Ultram and Celebrex for Mr. Ramirez' pain and indicated if the pain cannot be managed with medication, an arthroscopic surgical decompressive procedure of the subacromial space would be necessary.

Mr. Ramirez returned to Dr. Clark's office on April 25, 2001, with continued pain, at which point Dr. Clark further recommended the arthroscopic surgery to relieve the pain.

According to Dr. Clark's correspondence of June 8, 2001, the estimated cost of surgery, along with hospitalization, anesthesiologist fee and physical therapy is $15,000.00 with approximately six (6) months of recovery time. To date, Mr. Ramirez has incurred total medical expenses in the amount of $528.12, and with estimated future medical expenses in the amount of $15,000.00.

Furthermore, in addition to the aforementioned, Mr. Ramirez has missed approximately three (3) weeks of work for total lost wages in the amount of $480.00. Additionally, Mr. Ramirez is expected to be out of work to recover from his surgery for approximately six (6) months for total lost wages in the amount of $3,840.00.

## III.

## CONCLUSION

Prior to the August 22, 2000 incident, Mr. Ramirez led a very active life which, for the most part included the day to day activities while under the employment of Churches Chicken. However, because as a direct result of his injury, Mr. Ramirez has not only suffered a tremendous amount of pain, he has also lost

RECEIVED
JUN 2 5 2001

a substantial amount of time from work, all as a direct result of the injury to his left shoulder, which occurred during his course and scope of employment with your insured. This injury has certainly impaired Mr. Ramirez ability to find substantially similar employment because of the reduced amount of physical activity for which he cannot perform.

At this time, Mr. Ramirez has authorized us to make a demand to settle his claim. Because of the seriousness of his injuries and the clear liability on the part of your insured, and because the common law defenses normally available in the State of Texas, are unavailable to AFC/Churches because they are a non-subscriber, and due to the severity of the injury to Mr. Ramirez' shoulder, in light of the fact that the injury occurred as a result of direct orders from his immediate supervisor, which now requires surgery, our client has authorized us to make a demand of $150,000.00 or policy limits, whichever is less, for a full and final release of any and all claims against your insured, including the discharge and indemnity for medical, hospital, and other liens that may pertain to these claims.

We have provided you with sufficient information and documentation for your office to make a decision regarding this matter. We are making this offer to settle these claims at this time in order to prevent additional expenses and/or a lawsuit. We will hold this offer open for a period of twenty-one (21) days from the date of this letter. I believe this is sufficient time for you to review the information and make an evaluation regarding this claim. I look forward to your prompt response. Should you have any questions, please contact me.

RECEIVED

JUN 2 5 2001

GAB HOUSTON

-4-

Respectfully submitted,

Law Office of Aaron I. Vela
1 Paseo del Prado, Bldg. 101
Edinburg, Texas 78539
Telephone (956) 630-9990
Facsimile (956) 630-9472

By: _Aaron I. Vela_____

        Aaron I. Vela
        State Bar No. 00797598

RECEIVED

JUN 2 5 2001

GAB HOUSTON



United States District Court
Southern District of Texas
FILED

DEC 3 1 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS RAMIREZ, § 
§
    Plaintiff, §
§
v. § Civil Action No. B - 01 - 214
§
AFC ENTERPRISES, INC., §
§
    Defendant. §

## DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Pursuant to the Federal Arbitration Act ("FAA"), *9 U.S.C. §§ 1 et seq.*, Defendant AFC

Enterprises, Inc. ("AFC") moves to dismiss this action to permit an arbitration to proceed in

accordance with the parties' written arbitration agreement or, in the alternative, to affirmatively

compel Plaintiff to participate in an arbitration proceeding between the parties.

## BACKGROUND FACTS

Plaintiff alleges he was injured in the scope of his employment with AFC on August 22,

2000 at one of AFC's Churchs Chicken restaurants in Raymondville, Willacy County, Texas.

*Plaintiff's Original Petition at ¶ 4.1.* AFC is, and was at all pertinent times, a nonsubscriber to

the Texas Workers' Compensation Act. *Affidavit of Gary D. Sarles ("Sarles Affidavit", attached*

*hereto as Exhibit "A") at ¶ 2.* Instead, AFC has established the AFC Enterprises, Inc. Texas

Employee Injury Benefit Plan (the "AFC Plan") under the Employee Retirement Income Security

Act of 1974 ("ERISA") to provide medical, wage-replacement and death benefits to its Texas

employees injured or killed in the course and scope of their employment with AFC. *Sarles*

*Affidavit at ¶ 2.*

- 1 -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT

Pursuant to the Federal Arbitration Act ("FAA"), *9 U.S.C. §§ 1 et seq.*, Defendant AFC

Enterprises, Inc. ("AFC") moves to dismiss this action to permit an arbitration to proceed in

accordance with the parties' written arbitration agreement or, in the alternative, to affirmatively

compel Plaintiff to participate in an arbitration proceeding between the parties.

## BACKGROUND FACTS

Plaintiff alleges he was injured in the scope of his employment with AFC on August 22,

2000 at one of AFC's Churchs Chicken restaurants in Raymondville, Willacy County, Texas.

*Plaintiff's Original Petition at ¶ 4.1.* AFC is, and was at all pertinent times, a nonsubscriber to

the Texas Workers' Compensation Act. *Affidavit of Gary D. Sarles ("Sarles Affidavit", attached*

*hereto as Exhibit "A") at ¶ 2.* Instead, AFC has established the AFC Enterprises, Inc. Texas

Employee Injury Benefit Plan (the "AFC Plan") under the Employee Retirement Income Security

Act of 1974 ("ERISA") to provide medical, wage-replacement and death benefits to its Texas

employees injured or killed in the course and scope of their employment with AFC. *Sarles*

*Affidavit at ¶ 2.*

All Texas employees of AFC are required to sign an arbitration agreement to be eligible for the benefits provided by the AFC Plan for an on-the-job injury. *Id. at ¶ 3.* The arbitration agreement required as a condition precedent to participation in the AFC Plan is called the "Value Deal Agreement." *Id.* The Value Deal Agreement is mutually binding on both AFC and the employee. *Id. at ¶ 5.* AFC pays the entire cost of the benefits provided by the AFC Plan, pays the entire cost of administering the AFC Plan, and pays all but $350 of the fees and expenses of any arbitration initiated under the Value Deal Agreement. *Id.* The Value Deal Agreement does <u>not</u> waive or release any of an AFC employee's rights or remedies under Texas or federal law, except for the right to a judicial forum and jury trial. *Id. at ¶ 6.* The Value Deal Agreement is simply a mutual arbitration agreement. *Id.* On April 4, 2000 Plaintiff signed the Value Deal Agreement. *Id. at Exhibit 4.*

## SUMMARY OF ARGUMENT

AFC contends that the Value Deal Agreement signed by Plaintiff is a valid and enforceable arbitration agreement and that Plaintiff's claims in this lawsuit are within the scope of that agreement. Moreover, any dispute about the enforceability of the Value Deal Agreement signed by Plaintiff is itself a dispute that is subject to binding arbitration under the Agreement.

## ARGUMENT

The Value Deal Agreement provides that the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.* (the "FAA"), governs "the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement." Under the FAA and Fifth Circuit precedent, courts adjudicating a motion to compel arbitration under the FAA generally conduct a two-step inquiry, with the first step being to determine whether the parties agreed to arbitrate the dispute in

question. *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996).[1]  This first step itself

involves two determinations:  (1) whether there is a valid agreement to arbitrate between the

parties; and (2) whether the dispute in question falls within the scope of that agreement.

Taking these two determinations in reverse order, Plaintiff's claims in this lawsuit fall

squarely within the scope of the Value Deal Agreement signed by Plaintiff, and the Value Deal

Agreement is a valid and enforceable arbitration agreement under the Federal Arbitration Act.

## I.   PLAINTIFF'S CLAIMS ARE CLEARLY WITHIN THE SCOPE OF THE ARBITRATION AGREEMENT.

Federal policy favors arbitration and requires ambiguities as to the scope of the

arbitration clause to be resolved in favor of arbitration. *Webb*, 89 F.3d at 258 (*citing Volt Info.*

*Sciences, Inc. v. Board of Trustees of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475-76 (1989)).

In fact, the Fifth Circuit has held that a motion to compel arbitration should not be denied "unless

it can be said with positive assurance than an arbitration clause is not susceptible of an

interpretation which would cover the dispute at issue." *Neal v. Hardee's Food Systems, Inc.*, 918

F.2d 34, 37 (5th Cir. 1990)(*quoting Commerce Park at DFW Freeport v. Mardian Const. Co.*,

729 F.2d 334, 338 (5th Cir. 1984)).

The Value Deal Agreement Plaintiff signed provides in relevant part:

---

[1] The second step of the Fifth Circuit's two-step analysis is to determine "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Webb*, 89 F.3d at 257-58(*quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)). AFC submits that this step is not at issue here, since there is no federal statute precluding the Value Deal Agreement's enforcement. Moreover, although the Texas General Arbitration Act, Tex. Civ. Prac. & Rem. Code, §171.001, makes arbitration agreements covering personal injury actions enforceable only if signed by counsel for each party, the Fifth Circuit and Texas Supreme Court have both expressly held that this state statute is preempted by the FAA. *Miller v. Public Storage Mgmt., Inc.*, 121 F.3d 215, 219 (5th Cir. 1997); *EZ Pawn Corp. v. Mancias*, 934 S.W.2d 87, 91 (Tex. 1996).  In fact, an identical Value Deal Agreement has previously been held to be enforceable by the Fifth Circuit. *Strawn v. AFC Enterprises Inc. d/b/a Churchs Chicken*, No. 99-41384 slip op. at 9 (5th Cir. Nov. 29, 2000)(per curiam)(attached hereto at Exhibit "B" pursuant to Fifth Circuit Rule 47.5.4).

CLAIMS COVERED BY THIS AGREEMENT: Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC . . . and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims . . . for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment . . . .

*Sarles Affidavit at Exhibits 2, 4.* The only claims excluded from the agreement's coverage are criminal proceedings and claims for restitution from criminal acts by Employee. *Id.*

Given the broad scope of the Value Deal Agreement, there can be no dispute that Plaintiff's common-law bodily injury claims that are the subject of this lawsuit are within the agreement's scope. *See Neal*, 918 F.2d at 38 (holding that "any and all disputes" language of license agreement meant parties intended clause to reach "all aspects" of their relationship).

## II.    THE VALUE DEAL AGREEMENT IS VALID AND ENFORCEABLE.

The only issue appearing to AFC to be potentially disputed is whether the Value Deal Agreement signed by Plaintiff is enforceable. It clearly is enforceable under federal law.

### A.    The Value Deal Agreement Merely Substitutes an Arbitral Forum for a Judicial Forum--Substantive Legal Rights Are Not Waived or Released.

The only right waived or released by Plaintiff by signing the Value Deal Agreement was the right to a judicial forum and jury trial. Plaintiff's agreement to an arbitral rather than judicial forum for hearing his on-the-job injury negligence claim against AFC is not a waiver of even a substantive right. *See Gilmer v. Interstate/Johnson Lane Corp.*, 111 S. Ct. 1647, 1652 (1991)("'by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum'")(quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)); *Kinnebrew v. Gulf Ins. Co.*, 67 FEP (BNA) 189, 1994 WL 803508 (N.D. Tex. Nov. 28,

- 4 -

1994)(Buchmeyer, J.)(compelling arbitration even where arbitration agreement prevented recovery of punitive damages; holding that "substantive rights" of plaintiff-employee were not waived by the unilaterally-imposed arbitration policy in employee handbook).

The only anticipated attack by Plaintiff against his signed Value Deal Agreement might be that it is somehow unconscionable because the benefits provided by the AFC Plan would be alleged not to be equivalent to the benefits under the Texas Workers' Compensation Act, relying on *Reyes v. Storage & Processors, Inc.*, 995 S.W.2d 722 (Tex. App.--San Antonio 1999, pet. denied), *abrogated, Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 552-53 (Tex. 2001). In *Reyes*, a panel of the San Antonio Court of Appeals held that a nonsubscriber's **waiver** agreement -- not an arbitration agreement -- was void as against public policy. *Id.* at 728. Storage & Processors, Inc. ("S&P") required that its employees sign a waiver of claims against the company in order to participate in its occupational injury benefit plan. The waiver prohibited an injured employee who signed it from suing for occupational injuries, even including "death claims arising out of S&P's intentional and grossly negligent conduct." *Id.* The San Antonio Court of Appeals panel held the S&P benefit plan's "waiver" void because the S&P plan's benefits were not as extensive as those offered by a Texas workers' compensation insurance policy, and the waiver was broader than the Texas Workers' Compensation Act statutory bar. *Id.*

As previously pointed out, however, the Value Deal Agreement Plaintiff signed does not waive the employee's right to seek unlimited actual and even punitive damages. The Value Deal Agreement is simply an arbitration agreement promulgated under the Federal Arbitration Act.

Despite this distinction, Judge Kent in the Galveston Division attempted to invalidate an identical Value Deal Agreement -- relying in part on the *Reyes* opinion regarding waiver agreements -- on the basis that an arbitration agreement was void as against Texas public policy

- 5 -

where the benefit plan did not provide benefits as extensive as provided under the Texas Workers' Compensation Act.   On appeal, however, the Fifth Circuit vacated Judge Kent's opinion and remanded "with instructions to refer the case to arbitration." *Strawn v. AFC Enterprises Inc. d/b/a Churchs Chicken*, 70 F. Supp. 2d 717 (S.D. Tex. 1999), *vacated without published opinion*, 240 F.3d 1074, No. 99-41384, slip op. at 9 (5th Cir. 2000)(per curiam); *see also Hinojosa v. AFC Enterprises, Inc. d/b/a Churchs Chicken*, No. L-00-60, slip op. at 3 (S. D. Tex. Feb. 26, 2001)(Ellison, J., Laredo Division)(following *Strawn* and dismissing case without prejudice)(pursuant to Fifth Circuit Rule 47.5.4, slip opinions attached hereto at Exhibit B).

### B.    Arbitrability Is for the Arbitrator To Decide.

The Value Deal Agreement in the *Strawn* opinion, as in this case, was a "condition precedent" to the employee's employment. *Strawn*, slip op. at 2.  Judge Kent had found that "where employers offer minimal benefits and unilaterally impose an arbitral forum on their injured employees, such a forum is sufficiently dissimilar to a judicial forum as to undermine Texas public policy with respect to the workers' compensation system." *Id.* at 2-3 (quoting district court opinion, 70 F. Supp. 2d at 725-26).  The Fifth Circuit, however, found that under *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967), the district court should not have addressed the public policy issue at all.  *Strawn,* slip op. at 5-6.  Since Ms. Strawn had attacked not only the arbitration agreement, but also the benefits provided by a corresponding employee injury benefit plan, under *Prima Paint* the issue was for an arbitrator, not the district court, to decide.  *Id.* at 8-9; *Hinojosa,* slip op. at 3-4.  *See also Rojas v. TK Communications, Inc.*, 87 F.3d 745, 749 (5th Cir. 1996)(unconscionability attack on entire agreement, not arbitration clause, for the arbitrator); *R.M. Perez & Assoc., Inc. v. Welch*, 960

F.2d 534, 538 (5th Cir. 1992)(fraud in inducement to entire agreement, rather than arbitration clauses only, for the arbitrator).[2]

In short, Defendant is not aware of any authority for the proposition that a mere arbitration agreement, required as a condition of participation in a nonsubscriber's occupational injury benefit plan, is unconscionable, unenforceable or void.

WHEREFORE, Defendant requests that the Court either dismiss this lawsuit to allow Plaintiff to pursue arbitration before the American Arbitration Association in accordance with the terms of the parties' Value Deal Agreement[3] or stay this litigation pending arbitration of Plaintiff's claims pursuant to the Value Deal Agreement, that the Court award Defendant its attorneys' fees incurred in presenting this motion to the Court, and such other and further relief, either at law or in equity, to which it is entitled.

Respectfully submitted,

Gary D. Sarles
Texas Bar No. 17651100
Douglas C. Bracken
Texas Bar No. 00783697
**SARLES & OUIMET, L.L.P.**
370 Founders Square, 900 Jackson Street
Dallas, Texas  75202-4436
Telephone:  (214) 573-6300
Telecopier:  (214) 573-6306
**ATTORNEYS FOR DEFENDANT**

---

[2] The Fifth Circuit also found in *Strawn* that "[s]tanding alone, neither the benefit plan nor the arbitration clause violate Texas law or public policy." *Strawn*, slip op. at 8.  Since then, the Texas Supreme Court, expressly disapproving of *Reyes*, has held that even a waiver of the employee's claims does not violate Texas public policy and is enforceable regardless of the benefits made available to the employee. *Lawrence v. CDB Servs., Inc.*, 44 S.W.3d 544, 553 (Tex. 2001).  The Northern District reached that same decision in 1995 in *Brito v. Intex Aviation Services*, 879 F. Supp. 650, 654 (N.D. Tex. 1995)(McBryde, J.).

[3] A case may properly be dismissed with prejudice when all issues raised in the district court must be arbitrated. *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *Colorado v. Pacificare of Texas, Inc.*, 77 FEP (BNA) 1179, 1998 U.S. Dist. LEXIS 15876 (W.D. Tex. 1998)(Garcia, J.).



## CERTIFICATE OF CONFERENCE

This is to certify that in compliance with Local Rule 7.1.D., no conference is required for this Motion to Dismiss.

Douglas C. Bracken

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December 2001, a true and correct copy of this Defendant's Motion to Dismiss and Brief in Support was forwarded via first class mail to Plaintiff's counsel of record, Aaron I. Vela, 600 South Closner, Edinburg Texas 78539.

Douglas C. Bracken

- 8 -

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## AFFIDAVIT OF GARY D. SARLES

On this day Gary D. Sarles personally appeared before me, the undersigned notary public, and after first being sworn, testified as follows:

1.      My name is Gary D. Sarles.  I am over 21 years of age, have never been convicted of a felony, and am otherwise competent to make this Affidavit.  The statements made herein are true and correct and based upon my own personal knowledge.

2.      I am counsel of record in this lawsuit for the Defendant, AFC Enterprises, Inc. ("AFC").   AFC is, and was at all relevant times, a nonsubscriber to the Texas Workers' Compensation Act.   In 1995, I assisted AFC, then known as America's Favorite Chicken Company, in drafting and implementing an occupational injury benefit plan under the Employee Retirement Income Security Act of 1974 ("ERISA") to provide medical, wage-replacement and death benefits to its Texas employees injured or killed in the course and scope of their AFC employment ("the AFC Plan"), a true and correct copy of the applicable version of which is attached hereto as Exhibit 1.

3.      In order to participate in the AFC Plan and to be eligible for benefits from it in the event of an occupational injury, AFC's Texas employees are required to sign a mutual arbitration

**EXHIBIT "A"**

agreement known as the "Value Deal Agreement." Because AFC did not want to require existing employees who did not want to agree to the Value Deal Agreement either to be without benefits if injured or to resign, the AFC Plan offered to AFC's existing employees in June 1995 two levels of benefits. Basic benefits were provided to existing employees who rejected the Value Deal Agreement, and existing employees as of June 1995 who agreed to sign the Value Deal Agreement were offered more comprehensive benefits. AFC employees hired after June 1, 1995 were required to execute the Value Deal Agreement if they wished to accept employment at AFC, but those who chose to do so were provided the AFC Plan's more comprehensive benefits. A true and correct copy of the English version of the Value Deal Agreement presented to new hires after June 1, 1999 is attached hereto as Exhibit 2.

4.      In order to explain the AFC Plan's benefits, procedures and requirements to its Texas employees, AFC provides, in compliance with ERISA, each AFC Texas employee a copy of the AFC Plan's Summary Plan Description. Employees acknowledge receipt of the Summary Plan Description by signing the Value Deal Agreement. See Exhibit 2 at page 1. Attached hereto as Exhibit 3 is a true and correct copy of the AFC Enterprises, Inc. Texas Employee Injury Benefit Plan Summary Plan Description.

5.      The Value Deal Agreement is mutually binding on both AFC and the AFC Texas employee who signs it. The benefits provided by the AFC Plan are paid entirely by AFC, and AFC pays the entire cost of administering the AFC Plan. In order to prevent the cost of arbitration under the Value Deal Agreement from financially prohibiting its Texas employees from pursuing claims, AFC pays all but $350 of the fees and expenses of any arbitration initiated under the Value Deal Agreement.

6.    The Value Deal Agreement is a mutual arbitration agreement.  AFC's Texas employees do not waive or release any of their claims against AFC by executing the Value Deal Agreement.  There is no provision in the Value Deal Agreement that limits the damages, actual or punitive, or other remedies that an employee can recover in an arbitration.  Rather, an AFC Texas employee who executes the Value Deal Agreement simply agrees to pursue any claims and remedies against AFC in arbitration before the American Arbitration Association rather than in a judicial forum.  The second substantive paragraph on page one of the Value Deal Agreement expressly states that the employee who signs it acknowledges and understands that by doing so he or she gives up the right to a jury trial on the claims covered by the Value Deal Agreement.

7.    In the course of defending this lawsuit, I obtained from AFC records from AFC's personnel file for Plaintiff, Jesus Ramirez.  Attached hereto as Exhibit 4 is a true and correct copy of the signed Value Deal Agreement contained in his AFC personnel records.



Gary D. Sarles

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned notary public, on this _28th_ day of December, 2001. ———

Cynthia Perrio

Notary Public in and for the State of Texas

CYNTHIA PERRIO
Notary Public State of Texas
My Commission Expires 07-30-05

- 3 -

# AFC ENTERPRISES, INC.
# TEXAS EMPLOYEE INJURY BENEFIT PLAN

© 1999 AFC Enterprises, Inc.

## TABLE OF CONTENTS

Page

ARTICLE I - DEFINITIONS ................................................................. 1

    1.1    Accident ...................................................................... 1
    1.2    Beneficiary ................................................................... 1
    1.3    Cause ......................................................................... 2
    1.4    Combined Single Limit ................................................. 3
    1.5    Committee ................................................................... 3
    1.6    Company ..................................................................... 3
    1.7    Covered Charge .......................................................... 3
    1.8    Covered Employee ...................................................... 7
    1.9    Custodial Care ............................................................ 7
    1.10  Death Benefits ............................................................ 7
    1.11  Disability ..................................................................... 7
    1.12  Emergency Care .......................................................... 7
    1.13  Employee .................................................................... 8
    1.14  Employer ..................................................................... 8
    1.15  Facility ........................................................................ 8
    1.16  First Aid ...................................................................... 8
    1.17  Home Health Care ...................................................... 8
    1.18  Home Health Care Agency .......................................... 8
    1.19  Illness ......................................................................... 9
    1.20  Injury .......................................................................... 9
    1.21  Maximum Medical Improvement .................................. 13
    1.22  Medical Benefits ......................................................... 13
    1.23  Medically Necessary ................................................... 13
    1.24  Medical Rehabilitation Hospital ................................... 13
    1.25  Medicare .................................................................... 14
    1.26  Participant .................................................................. 14
    1.27  Physician ................................................................... 14
    1.28  Plan ........................................................................... 14
    1.29  Plan Administrator ...................................................... 14
    1.30  Plan Year ................................................................... 14
    1.31  Preexisting Condition .................................................. 14
    1.32  Pre-Injury Pay ............................................................ 14
    1.33  Short-Term Disability Benefits ..................................... 15
    1.34  Skilled Nursing Care ................................................... 15
    1.35  Skilled Nursing Facility ............................................... 15
    1.36  Transitional Duty ........................................................ 16
    1.37  Usual, Customary and Reasonable ............................. 16
    1.38  Value Deal Agreement ................................................ 16

i

© 1999 AFC Enterprises, Inc.

Page

ARTICLE II - ELIGIBILITY AND NATURE OF PAYMENTS ............................... 16

    2.1    Eligibility ................................................................................. 16
    2.2    Nature of Payments ................................................................ 17

ARTICLE III - BENEFITS .................................................................... 17

    3.1    Short-Term Disability Benefits ............................................... 17
    3.2    Death Benefits ....................................................................... 18
    3.3    Medical Benefits .................................................................... 18

ARTICLE IV - REQUIREMENTS AND LIMITATIONS OF BENEFITS .............. 19

    4.1    Reporting ............................................................................... 19
    4.2    Medical Treatment ................................................................. 19
    4.3    Time For Submitting Medical Claims ...................................... 20
    4.4    Second Medical Opinions ....................................................... 21
    4.5    Earnings After The Injury ....................................................... 21
    4.6    Acceleration Of Benefits ........................................................ 21
    4.7    Suspension Of Benefits ......................................................... 21
    4.8    Final Compromise And Settlement ......................................... 22
    4.9    Reduction For Prior Injuries ................................................... 23

ARTICLE V - ADMINISTRATION ......................................................... 23

    5.1    Plan Administrator .................................................................. 23
    5.2    Funding Policy And Method .................................................... 24
    5.3    Claims Procedure .................................................................. 24
    5.4    Professional Medical Review ................................................... 25

ARTICLE VI - COORDINATION OF BENEFITS AND SUBROGATION ........... 25

    6.1    Coordination of Benefits ........................................................ 25
    6.2    Recovery From Third Parties And Excess Payments ..................... 27
    6.3    Notice of Legal Proceedings .................................................. 27
    6.4    Assignment of Rights ............................................................ 27

ARTICLE VII - TERMINATION AND AMENDMENT ................................. 28

ARTICLE VIII - GENERAL PROVISIONS ................................................ 28

    8.1    Inability to Make Payment ..................................................... 28

© 1999 AFC Enterprises, Inc.

| 8.3 | Spendthrift Provision | 29 |
| 8.4 | Taxation of Benefit Payments | 29 |
| 8.5 | Employment Noncontractual | 29 |
| 8.6 | Discharge For Benefit Payments | 29 |
| 8.7 | Participation By Affiliates | 29 |
| 8.8 | Plan Documents Control | 29 |
| 8.9 | Construction | 29 |
| 8.10 | Separability | 30 |
| 8.11 | Applicable Law | 30 |

**EXHIBIT A:  VALUE DEAL AGREEMENT**

© 1999 AFC Enterprises, Inc.

# AFC ENTERPRISES, INC.
# TEXAS EMPLOYEE INJURY BENEFIT PLAN

This AFC ENTERPRISES, INC. TEXAS EMPLOYEE INJURY BENEFIT PLAN (the "Plan"), is made and executed at Atlanta, Georgia, by AFC ENTERPRISES, INC., a Minnesota corporation (the "Company").

## WITNESSETH THAT:

WHEREAS, the Company rejected coverage for its Texas employees under the Texas Workers' Compensation Act, effective as of September 21, 1991; and

WHEREAS, the Company established an employee welfare benefit plan subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), effective as of September 21, 1991, to provide a means by which the Company and other adopting employers can protect themselves from certain liabilities as nonsubscribers to the Texas workers' compensation insurance system by providing non-fringe disability, death, and medical benefits with respect to any personal injury sustained by an employee in the course and scope of employment; and

WHEREAS, the Company, then known as America's Favorite Chicken Company, amended and restated the plan in its entirety, effective as of June 1, 1995;

WHEREAS, the Company now desires to amend and restate the plan in its entirety, effective only for Injuries sustained in Accidents occurring after 12:01 a.m. on June 1, 1999;

NOW, THEREFORE, in consideration of the premises, the Company hereby amends and restates the Plan to provide benefits and be administered in accordance with the following:

## ARTICLE I

## DEFINITIONS

1.1    "Accident" means a sudden, unexpected, unusual, specific event which occurs at an identifiable time and place.

1.2    "Beneficiary" means the person or persons determined in the following priority:

(a)    If there is no Eligible Child, all Death Benefits shall be paid to the Eligible Spouse.

(b)    If there is no Eligible Spouse, Death Benefits shall be paid in equal shares to the Eligible Children.    If an Eligible Child has predeceased the

- 1 -

© 1999 AFC Enterprises, Inc.

Participant, Death Benefits that would have been paid to that child if he or she had survived the Participant shall be paid in equal shares per stirpes to the children of such deceased child.

(c)    If there is an Eligible Child and an Eligible Spouse, half of any Death Benefits shall be paid to the Eligible Spouse and the other half shall be paid in equal shares to the Eligible Children.    If an Eligible Child has predeceased the Participant, Death Benefits that would have been paid to that child if he or she had survived the Participant shall be paid in equal shares per stirpes to the children of such deceased child.

(d)    If the Employee is not survived by an Eligible Spouse or Eligible Child, any Death Benefits shall be paid to a surviving dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Committee may prescribe) of the Participant who is a parent, sibling, or grandparent of the deceased Participant. If more than one of those dependents survives the Participant, any Death Benefits shall be divided among them in equal shares.

(e)    If the Participant is not survived by an Eligible Spouse, Eligible Child, or dependent who is a parent, sibling, or grandparent, no Death Benefits shall be payable with respect to such Participant.

(f)    For purposes of this Section:

(1)    "Eligible Spouse" means the surviving spouse of the deceased Participant.

(2)    "Eligible Child" means a surviving child of the deceased Participant, whether by blood, marriage, or legal adoption, if the child is:

(A)    a minor;

(B)    enrolled as a full-time student in an accredited educational institution and is less than 25 years of age; or

(C)    because of a physical or mental handicap, a dependent (as determined in accordance with the support criteria set forth in section 152 of the Internal Revenue Code and such other rules as the Committee may prescribe) of the deceased Participant at the time of the Participant's death.

1.3    **"Cause"** means the Employee's gross "misconduct" within the meaning of Section 4980B of the Internal Revenue Code, as informed by interpretations and decisions under Section 201.012 of the Texas Labor Code.

- 2 -

© 1999 AFC Enterprises, Inc.

**1.4** **"Combined Single Limit"** means the total amount of all benefits payable to or with respect to any Participant under the Plan with respect to an Accident. Payments made for each of these forms of benefits shall be counted towards the Combined Single Limit amount. If a Participant has signed a Value Deal Agreement, the Combined Single Limit shall be $75,000. If a Participant has not signed a Value Deal Agreement, the Combined Single Limit shall be $25,000. Anything foregoing to the contrary notwithstanding, the aggregate amount of the Combined Single Limits with respect to all claims arising out of a single Accident shall not exceed $500,000. Such aggregate amount may proportionally reduce the Combined Single Limit applicable to each Participant involved in an Accident.

**1.5** **"Committee"** means the individual or individuals appointed by the Company pursuant to Section 5.1 to administer the Plan on behalf of the Company and all other Employers.

**1.6** **"Company"** means AFC Enterprises, Inc., a Minnesota corporation whose principal place of business is located in Atlanta, Georgia, or any successor thereto.

**1.7** **"Covered Charge"** means the cost to a Participant of a service or supply described in this Plan, which is reasonably required by the nature of the Injury as and when provided and which (i) cures or relieves the effects naturally resulting from the Injury; (ii) promotes recovery; or (iii) enhances the ability of the Participant to return to or retain employment.

(a)    Such service and supplies must be Medically Necessary. No cost shall be a Covered Charge to the extent that it exceeds the charge specified in any fee schedule adopted by the Committee. In the event such charge is not listed in such a fee schedule, the charge shall not be considered a Covered Charge to the extent it exceeds the Usual, Customary and Reasonable charge. The Committee shall be entitled to otherwise reduce the dollar amount of any otherwise Covered Charge by contract, through negotiation, or pursuant to Section 5.4.

(b)    A cost shall be a Covered Charge only if it is provided in accordance with the medical treatment requirements of Section 4.2.

(c)    Any provision of this Plan to the contrary notwithstanding:

(1)    The first Covered Charge must be incurred within 30 days following the date of the Injury; and

(2)    No further amount shall be considered a Covered Charge if the Participant does not receive medical treatment from a Physician for a period of more than 60 days.

(d)    Covered Charges shall include the cost of the following:

- 3 -

© 1999 AFC Enterprises, Inc.

(1)     Physician visits - at the hospital, Physician's office or, in the case of Home Health Care, at the Participant's home, including second opinion services requested by the Committee in accordance with Section 4.4;

(2)     Medical supplies, including the following:

(A)     Prescription drugs (generic unless trade name drugs are requested by a Physician);

(B)     Blood and other fluids (other than allergy, insulin, and similar drugs) injected into the circulatory system;

(C)     Oxygen and its administration;     _____

(D)     Upon the written advice or prescription of a Physician, rental or purchase of a wheelchair, iron lung, or other mechanical equipment necessary for the treatment of respiratory paralysis, and similar internal or external durable medical equipment designed primarily for therapeutic purposes;

(E)     Surgical dressings, bandages, splints, casts, crutches, syringes, needles, artificial limbs and eyes, trusses, braces, prostheses, special bras and girdles dispensed by a Physician; and

(F)     Other items according to guidelines approved by the Committee as Medically Necessary;

(3)     Outpatient services and supplies, including ambulatory day surgery, x-ray examinations, laboratory tests, diagnostic services, and nuclear medicine;

(4)     Occupational and physical therapy provided by a Physician or a licensed occupational therapist or licensed physical therapist; provided, however, that such services (and any provider of such services) must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services shall be subject to case management approval regarding the number of visits and the types and amount of services provided during such visits;

(5)     Inpatient rehabilitation services provided in a Medical Rehabilitation Hospital; provided, however, that such services must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services shall

- 4 -

be subject to continued stay review by the Committee and case management approval regarding the types and amount of services provided;

(6)    Room and board (semi-private) as an inpatient at a Facility;

(7)    Home Health Care up to 75 visits per Plan Year and up to eight hours per visit for the first two weeks of Home Health Care and up to four hours per visit thereafter;

(8)    Skilled Nursing Care, provided that a Physician monitors the progress of the Participant at least once during each 30-day period of confinement;

(9)    Blood and blood plasma (but only to the extent not available through any refund or allowance by a blood bank or similar organization);

(10)    Anesthesia and its administration;

(11)    Radiology and pathology, including interpretive services of a Physician;

(12)    Ambulance services - professional ground ambulance service or, if no other means of transportation can reasonably suffice to deliver the individual to the closest appropriate Facility, air ambulance, regularly scheduled railroad, or airlines;

(13)    Surgery, including surgery which restores a reasonable, normal functioning (subject to the exclusions in Subsection (e)(17) below);

(14)    Services of licensed oral surgeons - services for treatment of fractures and dislocations of the jaw or the replacement of sound natural teeth (excluding temporomandibular junction dysfunction services) when the injured Participant seeks treatment within 72 hours after the Injury;

(15)    Eyeglasses or contact lenses - one pair per Injury up to $125, inclusive of professional office visit charges;

(16)    External hearing aid - up to $600, inclusive of professional office visit charges;

(17)    Orthotics, arch supports, corrective shoes, corrective appliances, or any similar item, if approved in advance and in writing by the Committee or recommended by the treating Physician;

(18)    Organ and tissue transplant services, including kidney, heart, lung, liver, pancreas and bone marrow, excluding the donor's

- 5 -

© 1999 AFC Enterprises, Inc.

transportation costs, organ procurement costs and the donor's surgical expenses; and

(19)    Mental health services, but only when approved in advance and in writing by the Committee and such services are provided for mental or emotional damage or harm resulting from a Participant's being the victim of a criminal act occurring while such Participant is engaged in furthering the business of an Employer and which arises from the course and scope of such Participant's employment by an Employer.  Any such mental health services (including any provider of such services) must be approved in advance and in writing by the Committee.

(e)    Any provision of this Plan to the contrary notwithstanding, Covered Charges shall not include the cost of the following:

(1)    Services or supplies payable by any government or subdivision or agency thereof;

(2)    Services or supplies which are experimental, investigative, or for the purposes of research;

(3)    Services or supplies performed or provided while the Participant is not covered by the Plan;

(4)    Services or supplies for which the Participant is not legally obligated to pay or for which no charge would be made in the absence of the Plan;

(5)    Services or supplies for personal comfort or convenience, such as a private room, television, telephone, radio, guest trays, and similar items;

(6)    Fraudulent claims or claims not filed in good faith as determined by the Committee;

(7)    Canceled appointment charges;

(8)    Self-administered services;

(9)    Services in which the Participant's condition is persistently nonresponsive to treatment;

(10)    Services or supplies relating to Preexisting Conditions;

(11)    Acupuncture, behavior modification, or biofeedback, except to the extent approved in advance and  in writing by the Committee and recommended by the treating Physician;

- 6 -

© 1999 AFC Enterprises, Inc.

(12)    Services rendered primarily for training, testing, evaluation, counseling, or educational purposes, except to the extent approved in advance and in writing by the Committee;

(13)    Chiropractic or spinal manipulation services, except to the extent approved in advance and in writing by the Committee and recommended by the treating Physician;

(14)    Substance abuse services;

(15)    Custodial Care;

(16)    Any travel or lodging expenses that are not incurred pursuant to the direction of a Physician and approved in advance and in writing by the Committee;

(17)    Any services or supplies related to any of the following: a prior cosmetic surgery; surgical excision or reformation of any sagging skin of or on any part of the body such as the eyelids, face, neck, abdomen, arms, legs, or buttocks; any services performed in connection with the enlargement, reduction, or change in appearance of a portion of the body such as the breasts, lips, jaw, chin, nose, ears, or genitals; hair transplantation; chemical face peels or abrasions of the skin; or

(18)    The cost of any other service or supply not specified in Subsection (d) above.

1.8    "Covered Employee" means an Employee whose employment with the Employer is principally located within the State of Texas.

1.9    "Custodial Care" means care consisting of services and supplies provided to an individual in or out of an institution primarily to assist him in daily living activities, whether or not he is disabled, and no matter by whom recommended or furnished. Room and board and Skilled Nursing Care are not, however, considered Custodial Care if provided during confinement in a Facility, and if combined with other necessary therapeutic services, under accepted medical standards, which can reasonably be expected to substantially improve the individual's medical condition which resulted from an Injury.

1.10    "Death Benefits" means any benefit payable under Section 3.2.

1.11    "Disability" means the inability, commencing within 90 days from the date of the Accident causing the Injury, to attend to the material duties normally performed by the Participant on behalf of an Employer because of an Injury.

1.12    "Emergency Care" means a service or supply provided with respect to a

- 7 -

© 1999 AFC Enterprises, Inc.

medical condition manifesting itself by a sudden and unexpected onset of acute symptoms of sufficient severity that in the absence of immediate medical attention could reasonably be expected to (i) result in death, disfigurement, or permanent disability, (ii) place the individual's health in serious jeopardy, or (iii) result in serious impairment of any bodily organ, part, or function.

1.13    **"Employee"** means each employee of an Employer who is not an independent contractor or covered as a worker under any State's workers' compensation laws.

1.14    **"Employer"** means the Company and any other related trade or business that adopts the Plan pursuant to Section 8.7.

1.15    **"Facility"** means a hospital or other medical care facility either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a Participant.  No Facility is an agent of the Company.

1.16    **"First Aid"** means on-site primary medical care rendered in accordance with Employer policy.

1.17    **"Home Health Care"** means the following care provided to the Participant on the recommendation of a Physician at the Participant's home or a Home Health Care Agency:

(a)    intermittent nursing care by a(n):

(1)    Registered Nurse ("R.N.");
(2)    Licensed Practical Nurse ("L.P.N.");
(3)    Home Health Aide;
(4)    Occupational Therapist;
(5)    Physical Therapist; or
(6)    Licensed Vocational Nurse ("L.V.N.").

(b)    private duty nursing services of a R.N., L.V.N., or L.P.N.;

(c)    social work; and

(d)    nutrition services, including special meals;

provided, however, that Home Health Care services shall not include services provided by persons who ordinarily live in the same household as the Participant or who are related by blood, marriage, or legal adoption to the Participant or the Participant's spouse.

1.18    **"Home Health Care Agency"** means any of the following: (i) a home health care agency licensed by the State in which it is located, or (ii) a home health agency as defined by the Social Security Administration, or (iii) an organization which is

- 8 -

© 1999 AFC Enterprises, Inc.

certified by the Participant's Physician as an appropriate provider of Home Health Care, and which: (x) has a full-time administrator, (y) keeps written medical records, and (z) has at least one R.N. on staff, or the services of an R.N. available.

1.19 **"Illness"** means any abnormal condition or disorder caused by exposure to environmental factors and defined as an "Occupational Illness" by the Occupational Health and Safety Administration (OSHA).

1.20 **"Injury"** means damage or harm to the physical structure of the body incurred solely as the result of an Accident, and independently of any other cause. Such damage or harm must be incurred in the course and scope of employment by an Employer and in furtherance of the business of such Employer; provided, however, that the term "Injury" shall also include such damage or harm incurred solely as a result of on-site participation in "Habitat For Humanity" or "Day of Dreams" program sponsored by an Employer or such other program specifically covered by written decision of the Chief Executive Officer of the Company (or his or her designee), and independently of any other cause. Any provision of this Plan to the contrary notwithstanding, in order to be subject to this restated plan document, the date of such Injury must be on or after June 1, 1995. For all purposes of this Plan, the date of Injury shall be the date of the Accident resulting in the Injury.

(a) Any provision of this Plan to the contrary notwithstanding, the term Injury shall not include:

(1) any damage or harm to, or infection of, the eye or musculoskeletal structure resulting from use of a video display terminal, poor or inappropriate posture, or similar circumstances prescribed by the Committee which are of a chronic nature;

(2) any asbestos-related poisoning;

(3) except as otherwise covered within the definition of a Covered Charge, any mental injury, emotional distress, mental trauma or similar injury to the mental or emotional state of an employee, including without limitation, any mental or emotional damage or harm that arises primarily from a legitimate personnel action, including a transfer, promotion, demotion or termination of employment;

(4) damage or harm to the physical structure of the body, such as carpel tunnel syndrome, occurring as a result of repetitious, physically traumatic activities that occur over time;

(5) any Illness or disease, howsoever acquired and whatsoever named;

(6) ptomaine or bacterial infection, except when resulting from accidental ingestion or accidental inhalation of poisonous food substances,

- 9 -

© 1999 AFC Enterprises, Inc.

and except pyogenic infection which occurs with and as a result of an accidental cut or wound; or

    (7)    any heart attack, stroke, or aneurysm (an "attack"), unless –

        (A)    the attack can be identified as –

            (i)    occurring at a definite time and place; and

            (ii)    caused by a specific event occurring in the course, scope and furtherance of employment;

        (B)    the preponderance of the medical evidence regarding the attack indicates that the Participant's work rather than the natural progression of a preexisting heart condition or disease was a substantial contributing factor of the attack; and

        (C)    the attack was not triggered solely by emotional or mental stress factors, unless it was precipitated by a sudden work-related stimulus; or

    (8)    hernia, unless inguinal hernia that --

        (A)    appeared suddenly and immediately following the Injury;

        (B)    did not exist in any degree prior to the Injury; and

        (C)    was accompanied by pain.

    (b)    Furthermore, and any provision of this Plan to the contrary notwithstanding, no benefits (other than First Aid and Emergency Care provided in accordance with Section 3.3) shall be payable under the Plan if:

    (1)    the Injury occurred while the Participant was in a state of intoxication, or had otherwise lost the normal use of his or her mental or physical faculties as a result of the use of a drug or alcohol. For this purpose, the Participant shall be deemed to have been in a state of intoxication at the time of the Injury if a drug and/or alcohol test following the Injury finds –

        (A)    an alcohol concentration of 0.04 or more, where the terms "alcohol" and "alcohol concentration" have the meaning assigned in the Texas Alcoholic Beverage Code;

        (B)    any level of a controlled substance or controlled substance analog, as defined by the Controlled Substance Act,

- 10 -

© 1999 AFC Enterprises, Inc.

Texas Health and Safety Code; a dangerous drug, as defined by the Texas Health and Safety Code; an abusable glue or aerosol paint, as defined by the Texas Health and Safety Code; or any similar substance regulated under the laws of the State of Texas;

provided, however, that intoxication does not include the loss of normal use of mental or physical faculties resulting from the introduction into the body of a substance taken under and in accordance with a prescription written for the Participant by the Participant's doctor (unless the Participant should have reasonably known, due to prescription warnings or otherwise, that such loss of normal use might occur) or a substance listed above by inhalation or absorption incidental to the Participant's work for an Employer;

(2)     the Injury was caused by the Participant's willful intention and attempt to injure himself or herself or to injure another person, whether the Participant was sane or insane;

(3)     the Participant's horseplay, scuffling, fighting, or similar inappropriate behavior was a producing cause of the Injury;

(4)     the Injury was incurred while the Participant was "on suspension" or "laid off" by his or her Employer;

(5)     the Injury arose out of an act of a third person intended to injure the Participant because of personal reasons and not directed at the Participant as an Employee of or because of his or her employment by an Employer;

(6)     the Injury arose out of voluntary participation in an off-duty recreational, social or athletic activity not constituting part of the Participant's work-related duties, except where these activities are expressly covered by written decision of the Chief Executive Officer of the Company (or his or her designee), as provided above in this Section 1.20;

(7)     the Injury arose out of an act of God, unless the Participant's employment by an Employer exposes such Participant to a greater risk of Injury from an act of God than ordinarily applies to the general public;

(8)     the alleged Injury is feigned or an attempt to defraud the Employer;

(9)     the Injury occurred, in whole or in part, in connection with the Participant's (i) violation of his or her Employer's employment policies or safety rules (including, but not limited to, willful disregard of express direction by a supervisor), or (ii) failure to obtain available assistance provided for his or her benefit to accomplish a particular task or to properly utilize available appropriate equipment or appliances;

- 11 -

© 1999 AFC Enterprises, Inc.

(10)    the Injury occurred during commuting travel to or from work for an Employer.   However, if one of the essential functions of the employee's position. with an Employer require him or her to travel in the furtherance of the affairs or business of the Employer, an Injury occurring in the normal course of such travel will be covered under this Plan; provided, however, that if a particular trip is also in furtherance of personal or private affairs of the Participant, no coverage will be provided under this Plan for such an Injury, unless:

(A)    the trip to the place where the Accident occurred would have been made even if there had been no personal or private affairs of the Participant involved in the trip; and

(B)    the trip would not have been made had there been no affairs of the Employer involved in the trip;

(11)    the Injury arose out of a declared or undeclared act of war, armed invasion, or aggression;

(12)    the Injury arose out of an atomic explosion or other release of nuclear energy (except when nuclear energy is being used solely for medical treatment of an illness), whether in peacetime or at time of war, and whether intended or accidental;

(13)    the Injury arose out of the injured Participant's participation in the commission of any crime;

(14)    the Participant receives benefits with respect to the Injury from any workers' compensation or occupational disease law, whether or not any coverage for such benefits is actually in force;

(15)    the Participant has been untruthful in regard to any aspect of the required information supplied as part of the injury reporting or employment process, particularly with regard to misinformation as to physical or mental abilities to perform the essential functions of the job; or

(16)    the Participant is untruthful or otherwise fails to fully cooperate with the Committee or demonstrates bad faith in connection with the administration of the Plan, including, but not limited to, subrogation or coordination of benefits procedures.

(c)    Any provision of this Plan to the contrary notwithstanding, if a Participant suffers a Disability due to an Injury, is certified by the treating Physician as able to return to work (whether to such Participant's pre-Disability duty or Transitional Duty and without regard to whether such Participant actually returns to work), and again becomes Disabled as the result of the same Injury,

- 12 -

© 1999 AFC Enterprises, Inc.

then the subsequent period of Disability shall be deemed to be part of the prior period of Disability and attributable to the same Injury for purposes of applying any applicable limitation on benefits, unless the subsequent period of Disability results from an Injury sustained in a separate Accident.

1.21   **"Maximum Medical Improvement"** shall mean the point at which the attending Physician determines that a Participant who suffered an Injury will not improve substantially as a result of additional medical treatment or physical therapy.

1.22   **"Medical Benefits"** means any benefit payable under Section 3.3.

1.23   **"Medically Necessary"** means the services or supplies which are required to identify or treat a Participant's Injury and which are:

(a)   consistent with the symptom or diagnosis and treatment of the Participant's Injury;

(b)   appropriate with regard to standards of sound medical practice;

(c)   not primarily Custodial Care;

(d)   services that could not have been omitted without adversely affecting the Participant's condition or the quality of medical care rendered;

(e)   not solely for the convenience of a Participant, Physician, or Facility; and

(f)   the most appropriate supply or level of service which can be safely provided to the Participant.

For an inpatient, the Participant's medical symptoms or condition require that the services cannot be safely provided to the Participant as an outpatient. Even though a Physician may have prescribed a particular treatment, such treatment may not be considered Medically Necessary within this definition.

1.24   **"Medical Rehabilitation Hospital"** means a Facility that:

(a)   is licensed;

(b)   provides facilities for the diagnosis and inpatient rehabilitative treatment of disease or injury with the objective of restoring physical function to the fullest extent possible. Examples of conditions treated in a rehabilitation hospital are: amputations, spinal cord injuries, head injuries, paraplegia and quadriplegia, cerebrovascular accident, severe arthritis, paralysis;

(c)   has facilities or a contractual agreement with another hospital in the

- 13 -

© 1999 AFC Enterprises, Inc.

area for emergency treatment, surgery, and any other diagnostic or therapeutic services that might be required during a confinement;

(d)     provides all normal infirmary level medical services required for the treatment of any disease or injury occurring during confinement;

(e)     has a staff of physicians specializing in physical medicine and rehabilitation directly involved in the treatment program, one of whom is present at all times during the treatment day;

(f)     is accredited as a medical inpatient rehabilitation hospital by the Joint Commission on Accreditation of Rehabilitation Facilities;

(g)     is not a place for rest, the aged, drug addicts or alcoholics, a chronic disease facility, a nursing home or sheltered workshop; and

(h)     does not provide as its primary purpose custodial care, treatment of mental disorders, special education, vocational counseling, job training, or social adjustment services.  Note: any identifiable charges for educational, vocational or social adjustment services are not covered, unless otherwise provided as a Covered Charge.

**1.25**   **"Medicare"** means Title XVIII of the Social Security Act, as amended, and the regulations promulgated thereunder.

**1.26**   **"Participant"** means a Covered Employee who satisfies the eligibility requirements of Article II.

**1.27**   **"Physician"** means a person duly licensed under Texas law as a Medical Doctor or Doctor of Osteopathy and either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a Participant.  No Physician is an agent of the Company.

**1.28**   **"Plan"** means this AFC Enterprises, Inc. Texas Employee Injury Benefit Plan as herein set forth and as it may from time to time be amended.

**1.29**   **"Plan Administrator"** means the Company.

**1.30**   **"Plan Year"** means a 12 calendar month period beginning each January 1 and ending the following December 31.

**1.31**   **"Preexisting Condition"** means any illness, injury, disease, or other physical or mental condition, whether or not work-related, which originated or existed prior to the Accident.

**1.32**   **"Pre-Injury Pay"** means --

- 14 -

© 1999 AFC Enterprises, Inc.

(a)    for salaried Participants, regular weekly salary from an Employer as of the date he or she becomes Disabled;

(b)    for hourly Participants, the average regular straight-time rate of pay from an Employer for the four consecutive weeks immediately preceding the date the Disability begins; provided, however, that if an hourly employee has worked for an Employer for fewer than four weeks immediately preceding the date the Disability begins, or if such four consecutive week period included any vacation time, sick leave, or other approved leave of absence, or if his or her earnings as of such date have not been fixed or cannot otherwise be reasonably determined (in the judgment of the Committee), such four-week average shall be based upon the earnings received over such period by a similar employee of such Employer.

"Pre-injury Pay" shall not include any overtime, bonuses, commissions, benefits or other extraordinary remuneration. "Pre-injury Pay" shall include amounts excludible from the Participant's gross income that are contributed by an Employer, at the Participant's election, to a 401(k) arrangement or cafeteria plan.

1.33    "**Short-Term Disability Benefits**" means any benefit payable under Section 3.1.

1.34    "**Skilled Nursing Care**" means service provided in a Skilled Nursing facility by a R.N., L.P.N., or licensed vocational nurse (L.V.N.), provided the care is Medically Necessary and the treating Physician has prescribed such care. However, no benefit will be payable under the Plan for the following expenses:

(a)    charges for food, housing, or homemaker's services;

(b)    charges for the services of a person licensed or unlicensed who ordinarily resides in the Participant's home or is a member of the family of either the Participant or the Participant's spouse;

(c)    charges for an illness or injury unrelated to the original Hospital confinement; or

(d)    charges that do not follow a Hospital stay or are incurred when the Participant could otherwise receive services from private duty nursing at home.

1.35    "**Skilled Nursing Facility**" means an institution which is a Facility and is (i) duly licensed as an extended care facility, skilled nursing facility, or convalescent facility, and operates in accordance with governing laws and regulations; (ii) regularly provides inpatient Skilled Nursing Care for payment during the active or convalescent stage of an injury or illness; (iii) is staffed with a Physician or registered nurse on duty 24 hours a day; (iv) operates in accordance with medical policies supervised and established by a Physician other than the patient's own Physician; (v) regularly maintains a daily medical record for each patient; (vi) is not, other than incidentally, a place for the aged, a place for individuals addicted to drugs or alcohol, or a place for

- 15 -

© 1999 AFC Enterprises, Inc.

Custodial Care; and (vii) is recognized as an extended care facility or a skilled nursing facility under Medicare.

1.36 **"Transitional Duty"** means work that the Participant is capable of performing in accordance with the AFC Enterprises, Inc. Transitional Return-To-Work Program.

1.37 **"Usual, Customary and Reasonable"** means a charge which is not more than the amount charged when there is no insurance, and is not more than the prevailing charge in the locality for a like service or supply. A like service is one of the same in nature and duration, requiring the same skill and performed by one of similar training and experience. A like supply is one which is the same or substantially equivalent. Locality is the city or town where the service or supply is obtained, if it is large enough so that a representative cross-section of like services or supplies can be obtained. In large cities, it may be a section or sections of the city, if the above criteria can be met. In smaller urban or rural areas, locality may have to be expanded to include surrounding areas to arrive at a representative cross-section.

1.38 **"Value Deal Agreement"** means a written agreement between an Employer and a Participant agreeing to resolve disputes through arbitration, substantially in the form of either form of Exhibit A attached hereto or, for Covered Employees already employed by an Employer prior to June 1, 1999 who have not executed a Value Deal Agreement in the forms of Exhibit A attached hereto, either of the forms of Exhibit A attached to the June 1, 1995 version of this Plan. For purposes of this Plan, where higher benefits are payable to a Participant who has signed and accepted the terms of a "Current Employee" form of the Value Deal Agreement, such agreement must be in full force and effect as of the date of the Injury and the date of benefit payment.

## ARTICLE II

## ELIGIBILITY AND NATURE OF PAYMENTS

2.1 <u>Eligibility</u>. Each Covered Employee shall be eligible to participate in this Plan, as herein amended and restated, as of the later of (i) 12:01 a.m., June 1, 1999, or (ii) the time and date of his or her employment as a Covered Employee.

(a) **Existing Employees:** Each Covered Employee who is a Participant in the prior version of this Plan, as existing before June 1, 1999, shall automatically become a Participant in this Plan, as herein amended and restated, as of 12:01 a.m., June 1, 1999 and shall be eligible for benefits in such amounts, percentages and durations dependent upon whether the Covered Employee has previously agreed to or rejected the terms of a Value Deal Agreement.

(b) **New Employees:** Each Covered Employee who is not a Participant in the prior version of this Plan, as existing before June 1, 1999, shall

- 16 -

© 1999 AFC Enterprises, Inc.

be eligible to elect to be a Participant in this Plan, as herein amended and restated, as of the time and date that his or her employment as a Covered Employee begins. In order to elect to participate in the Plan and as a condition to participation in this Plan, as herein amended and restated, a Covered Employee must sign a Value Deal Agreement in one of the forms attached hereto as Exhibit A and made a part hereof for all purposes. A Covered Employee who has delivered to the Committee (or its designee) such a fully-executed Value Deal Agreement shall be eligible for the benefits provided for in this Plan, as herein amended and restated, as of the later of (i) 12:01 a.m. on June 1, 1999, or (ii) 12:01 a.m. on the date of his or her fully-executed Value Deal Agreement.

(c)    **Cessation of Participation:** Except to the limited extent provided under Article III regarding the continuation of certain benefit payments, if a Participant ceases to be a Covered Employee, he or she shall thereupon cease to participate in this Plan; provided, however, that if such Participant is thereafter reemployed as a Covered Employee, he or she shall resume participating in the Plan as of the time and date of such reemployment.

2.2    **Nature of Payments.**

(a)    **No Admission of Liability:** The Plan has been established and is maintained by the Employers to protect themselves from certain liabilities as nonsubscribers to the Texas Workers' Compensation Act. Payments made under this Plan by an Employer shall not in any way constitute an admission of liability or responsibility by an Employer for an Injury and any such liability or responsibility is specifically denied.

(b)    **No Collateral Source:** Benefit payments under the Plan shall be considered to be made by the Employer of a Participant and shall not be considered payment from a "collateral source" as that term has been defined under any applicable rule, statute, judicial decision, or directive. All benefits paid under this Plan shall be offset against any alleged liability of the Employer, its officers, directors, or agents to a Participant or Participant's beneficiaries, heirs, or assigns due to an Injury.

## ARTICLE III

## BENEFITS

Participants shall be entitled to receive under this Plan the benefits described in this Article III with respect to any Injury incurred (i) in the course and scope of such Participant's employment by an Employer, (ii) in the furtherance of the business of such Employer, and (iii) during his or her participation in this Plan.

3.1    **Short-Term Disability Benefits.** From the first day (or the 8th day if the Participant has not signed and agreed to the terms of a Value Deal Agreement)

- 17 -

© 1999 AFC Enterprises, Inc.

following the later of (i) the date of an Injury, or (ii) the date an injured Participant's Disability begins, the Plan shall pay Short-Term Disability Benefits equal to 85% (or 70% if the Participant has not signed and agreed to the terms of a Value Deal Agreement) of an injured Participant's Pre-Injury Pay, minus such Participant's earnings from any employer after such Disability begins.

(a)    Short-Term Disability Benefits are calculated on a weekly basis, and paid on regular paydays. Payments for portions of a week shall be prorated. Only the Participant's normal, scheduled workdays shall be considered in calculating benefits.

(b)    Short-Term Disability Benefits shall continue until the earliest of (i) the expiration of 104 weeks (or 26 weeks if the Participant has not signed and agreed to the terms of a Value Deal Agreement) from the date such benefits begin to accrue, (ii) the date the Participant is released by the treating Physician to return to work for an Employer, whether to such Participant's pre-Disability duty or Transitional Duty and without regard to whether such Participant actually returns to work on that date, (iii) the date that the Combined Single Limit is met, (iv) the date of termination of both the Participant's status as a Covered Employee and all other employment of the Participant with an Employer, or (v) the date that the attending Physician determines that the Participant has reached Maximum Medical Improvement.

3.2    **Death Benefits.**  In the event that a Participant dies as the direct and sole result of, and within 365 days of, an Injury, and has signed and agreed to the terms of a Value Deal Agreement, then the Plan shall pay such Participant's Beneficiary a Death Benefit equal to two times the Participant's annualized Pre-Injury Pay (such dollar amount is referred to herein as the "Principal Sum").  The Principal Sum shall be reduced to the extent necessary to avoid exceeding the Combined Single Limit.  The Death Benefit shall be paid to the Participant's Beneficiary as follows: (i) 20% of the Death Benefit shall be paid in a lump sum cash payment as soon as administratively possible following the death of the Participant and the determination of the proper Beneficiary; and (ii) the remainder of the Death Benefit shall be paid in 59 equal monthly installments (without interest) commencing on the first day of the month following the initial lump sum payment.  Death Benefits payable under this Plan shall be in addition to Short-Term Disability Benefits and Medical Benefits payable with respect to any one Accident; provided, however, that the Combined Single Limit shall not be exceeded.

3.3    **Medical Benefits.**  The Plan shall pay Medical Benefits to or with respect to an injured Participant in an amount equal to all Covered Charges; provided, however, that the Combined Single Limit shall not be exceeded, and Medical Benefits shall cease upon the earlier of (i) the expiration 104 weeks (or 26 weeks if the Participant has not signed and agreed to the terms of a Value Deal Agreement) from the date of an Injury, (ii) termination for Cause of both the Participant's status as a Covered Employee and all other employment of the Participant with an Employer, or (iii) the date that the attending Physician determines that the Participant has reached Maximum Medical Improvement.

- 18 -

© 1999 AFC Enterprises, Inc.

## ARTICLE IV

## ADDITIONAL REQUIREMENTS AND LIMITATIONS ON BENEFITS

**4.1    Reporting.** The Participant must report every incident or fact that the Participant believes results or might reasonably be expected to result in an Injury in accordance with the following requirements:

(a)    **Notice of Injury:** The Participant must notify his or her restaurant manager or immediate supervisor then on duty immediately after being injured at work, no matter how minor the Injury appears to be. This notice must be provided no later than the end of the workshift for the date of the Injury. If the Participant is a driver or otherwise traveling for an Employer, and -

(1)    if the Injury occurs during office hours, as soon as the Participant can reach a telephone, he or she must call his or her immediate supervisor, or

(2)    if the Injury occurs after office hours, the Participant must call his or her immediate supervisor as soon as possible and within 24 hours after the Accident that caused the Injury.

No benefits will be payable under the Plan if notice is not provided as required above, unless (i) the Participant's restaurant manager or supervisor then on duty has actual knowledge of the Injury, or (ii) the Committee determines that good cause exists for failure to give notice in a timely manner. In addition to the foregoing, the Participant must also notify his or her restaurant manager or supervisor of expected recovery time immediately after receiving primary medical treatment and after each succeeding appointment with the treating Physician.

(b)    **Providing Required Information:** An injured Participant (or a person acting on his or her behalf) and such Participant's restaurant manager or supervisor then on duty (or such other person as the Committee may specify) must complete such Injury report forms, file such written statements, and provide such proof and demonstrations, in such manner and within such periods, as the Committee may from time-to-time direct. All such information must be provided (if possible) by the end of the workshift for the date of the Injury, but not later than three days following the date of the Injury. No benefits will be payable under the Plan if all required information is not provided as required above, unless the Committee determines that good cause exists for failure to provide such information in a complete and timely manner.

## 4.2    Medical Treatment.

(a)    **Use of Approved Providers:** A medical expense incurred with respect to a Participant shall be paid or subject to reimbursement under this Plan only if it is provided either:

- 19 -

© 1999 AFC Enterprises, Inc.

(1)    by or under the direction of a Physician or Facility, acting within the scope of the Physician's or Facility's license and area of specialization; or

(2)    (i) as Emergency Care; and

(ii) transportation to a Physician or Facility is not available, or a Physician or Facility is not within reasonable proximity to the location of the Participant (taking into account the nature of the Injury); and

(iii)    the Participant's restaurant manager (or immediate supervisor, if the Participant does not work in a restaurant) receives notification of such care no later than the next business day of the Participant's restaurant (or the next business day of the Company if the Participant does not work in a restaurant or earlier notice to the Participant's restaurant manager cannot be given due to interruption of the normal operation of Participant's restaurant); and

(iv)    after receiving primary Emergency Care, subsequent treatments are provided by or at the direction of a Physician or Facility.

**(b)    Medical Determinations and Treatment:** All determinations relating to the physical condition of a Participant, upon which the amount or duration of benefits is based (for example, inability to return to work or results of a prior injury), must be made by a Physician. The Participant must follow fully and completely the advice of, and the course of medical treatment prescribed by, the treating Physician, and must keep all scheduled appointments to fulfill the prescribed medical treatment plan. The Committee, treating Physician, or Emergency Care provider may require that the Participant present an authorization and report form to, and submit to any form of drug and alcohol testing by, the treating Physician or Emergency Care provider at the time of primary medical treatment. The Committee shall have the right to require the Participant to be examined or reexamined by a Physician (including, but not limited to an autopsy, where not forbidden by law) as often as they determine to be reasonably necessary. or appropriate during the pendency of a claim for benefits under the Plan. The Company reserves the right to add to, delete from, or otherwise amend its list of approved Physicians or Facilities, at any time. Although benefits under this Plan are conditioned on a Participant's use of only approved Physicians and Facilities, no Physician or Facility is an agent of any Employer and a Participant remains entitled to seek any medical care he or she deems appropriate from any provider of his or her choice at his or her expense.

4.3    **Time For Submitting Medical Claims.** All requests for payment or reimbursement of Covered Charges must be filed with the Committee or its designated representative within 30 days from the date such expenses are incurred or, if later, the date such Participant receives an invoice from a Physician, Facility, or other health care provider (in the case of Emergency Care) for such expenses.

- 20 -

© 1999 AFC Enterprises, Inc.

**4.4    Second Medical Opinions.** The Plan reserves the right to require a second medical opinion from a Physician selected by the Committee. If an injured Participant refuses to be examined by a Physician selected by the Committee for the second opinion, all benefits under the Plan will be suspended. The Committee shall weigh the findings of the treating Physician and the Physician providing the second opinion and make a benefit determination under the Plan. However, if the Participant is in disagreement with the diagnosis or treatment recommended by the Physician whose opinion is accepted by the Committee (the "Committee's Physician"), then the Participant shall have the right to be examined at his or her own expense by another Physician (the "Participant's Physician"). If the diagnosis and treatment recommended by the Participant's Physician is contrary to that of the Committee's Physician, then the Participant shall be examined by another Physician selected by the Committee's Physician and the Participant's Physician. If the Participant refuses to be so examined, all benefits under the Plan shall be suspended. The diagnosis and recommended treatment of the Physician so selected shall be controlling. Such Physician's fees and related expenses shall be shared equally by the Plan and the Participant.

**4.5    Earnings After The Injury.** If an injured Participant is offered, or with reasonable diligence could be offered, a bona fide position of employment with an employer (other than an Employer, as defined in this Plan) that he or she is capable of performing, given his or her physical condition and the geographic accessibility of the position to such Participant, then the Participant's "earnings from any employer after such Disability begins" (within the meaning of Section 3.1) shall be deemed at least equivalent to the weekly earnings for the position offered or available to such Participant, without regard to whether the Participant accepts the position; provided, however, that this reduction in Short-Term Disability Benefits shall only apply with respect to earnings for periods of time that the Participant, if not Disabled, would likely have (in the judgment of the Committee) been working for an Employer.

**4.6    Acceleration Of Benefits.** A Participant or beneficiary may make application to the Committee for acceleration of benefits payable under Article III in accordance with such rules and procedures as the Committee may prescribe.

**4.7    Suspension Of Benefits.** The Committee may deny a claim for or suspend the payment of Plan benefits otherwise due a Participant if:

(a)    the Participant refuses to submit to drug and alcohol testing;

(b)    the Participant fails to provide a complete statement, affidavit, or deposition concerning the incident that the Participant believes resulted in an Injury upon request by the Committee;

(c)    the Participant utilizes a non-designated physician or facility other than for Emergency Care;

(d)    the Participant fails to follow the directions or ceases to be under the care of a treating Physician;

- 21 -

© 1999 AFC Enterprises, Inc.

(e)    the Participant fails to keep all scheduled appointments with health care providers;

(f)    the Participant engages in conduct following an Injury which is determined by the treating Physician to be an injurious practice that is hindering the Participant's recovery from the Injury;

(g)    the Participant fails or refuses to report in to the Participant's supervisor periodically as directed until able to return to work, including notice of expected recovery time after each appointment with the treating Physician;

(h)    the Participant's employment with an Employer is terminated for Cause;

(i)    the Participant fails to personally pick up his or her check for Short Term Disability Benefits provided under the Plan.  This requirement may be waived by the Committee upon a showing that the Participant is physically or geographically unable to comply;

(j)    the Participant fails or refuses to comply with any of the provisions of the Plan or the rules and procedures adopted by the Committee for the administration of the Plan;

(k)    the Participant fails to return to work for an Employer after:

(1)    the treating Physician has released the Participant to return to work for an Employer; and

(2)    the Participant is scheduled to return to work for an Employer.

(l)    the Participant fails to report to the Employer immediately after being informed that he or she has reached Maximum Medical Improvement;

(m)    the Participant fails or refuses to allow an authorized representative of the Plan to accompany the Participant to an appointment with a Physician; or

(n)    the Participant or his or her Beneficiary, spouse, child, heir, parent, sibling or legal representative brings a lawsuit in violation of the Value Deal Agreement.

4.8    **Final Compromise And Settlement** The Plan, a Participant, an Employer, and any other related parties may, at any time after the date of Injury and prior to the payment of all benefits relating to such Injury, enter into a final compromise and settlement of any remaining benefits payable to or with respect to such Participant.

- 22 -

© 1999 AFC Enterprises, Inc.

**4.9    Reduction For Prior Injuries.** Benefits shall be reduced to the extent an otherwise Covered Charge or Injury, or the Participant's inability to return to work is the result of (i) a prior injury, or (ii) a Preexisting Condition. If the Committee is unable to determine an appropriate reduction of benefits, the Committee shall have the authority to completely deny any form of benefit under the Plan.

**ARTICLE V**

**ADMINISTRATION**

**5.1    Plan Administrator.**

    **(a)    Administrator:** The Company shall be the Plan Administrator of the Plan. The Plan shall be administered on behalf of the Company and all other Employers by a committee (the "Committee") composed of one or more individuals appointed by the Company. Each member of the Committee so appointed shall serve in such office until his or her death, resignation, or removal by the Company. The Company may remove any member of the Committee with or without cause, at any time, and may fill any vacancies with respect to Committee membership or add additional members to the Committee at any time and from time to time. The Committee shall act by a majority of its members at the time in office. The Committee may by such majority action authorize any one or more of its members to execute any document or documents on behalf of the Committee. The Committee shall keep such records of its proceedings and acts as it deems to be necessary or appropriate for the purposes of the Plan. The Committee shall cause such information, documents or reports to be prepared, provided and/or filed as may be necessary to comply with the provisions of ERISA, or any other applicable law. Members of the Committee shall receive no remuneration from the Plan for their services as Committee members. The Plan shall operate and keep its records on the basis of the Plan Year.

    **(b)    Administrative Authority:** The Committee shall have discretionary and final authority to interpret and implement the provisions of the Plan. The Committee shall perform all of the duties and may exercise all of the powers and discretion that the Committee deems necessary or appropriate for the proper administration of the Plan, and shall do so in a uniform, nondiscriminatory manner. Every interpretation, choice, determination or other exercise by the Committee of any power or discretion given either expressly or by implication to it shall be conclusive and binding upon all parties having or claiming to have an interest under the Plan or otherwise directly or indirectly affected by such action, without restriction, however, on the right of the Committee to reconsider and redetermine such action. The Committee may adopt such rules and procedures for the administration of the Plan as are consistent with the terms hereof, and have such rules and procedures incorporated into the Summary Plan Description for this Plan.

- 23 -

© 1999 AFC Enterprises, Inc.

(c)    **Delegation of Responsibilities:** The Committee's authority shall include, but not be limited to, the power to allocate or delegate fiduciary and nonfiduciary responsibilities or duties among the members of the Committee or to third persons, including any contract administrator, and, except as is otherwise provided by applicable law, those persons to whom such responsibilities and duties have not been allocated or delegated shall not be liable for any act or omission of those persons to whom such responsibilities and duties have been allocated or delegated.

5.2    **Funding Policy And Method.** All benefits payable to or with respect to a Participant under this Plan shall be paid or provided for by the Employer who was the employer of such Participant at the time of his or her Injury. Unless provided by a trust established pursuant to the Plan, said benefits shall be paid by such Employer at the direction of the Committee or its designated representative solely out of the general assets of such Employer. The Employers shall have no obligation to establish any fund or trust for the payment of benefits under this Plan. An Employer shall have no obligation, but shall have the right, to obtain insurance contracts with one or more insurers to provide funds to the Employer that can be used, if the Employer so desires in its sole discretion, to pay all or any portion of a benefit payable under this Plan. Any such funds shall not be considered "plan assets" for purposes of ERISA and shall constitute a part of the general assets of the Employer. Any such insurance contract shall be owned by, and (unless contrary to legal requirements adhered to by the insurer) all amounts shall be payable thereunder to, the Employer that applied for the contract, and no Participant shall have any interest in, or right to, any amounts payable under the contract. As a condition to the receipt of benefits under this Plan, and unless otherwise prohibited by law, the Committee may require a Participant to sign a form prescribed by the Committee which will serve to assign all or a portion of any benefits payable under such an insurance contract to the Employer that applied for the contract. If, notwithstanding the provisions of this Section 5.2, any insurance benefits are paid directly by an insurance company to a Participant or beneficiary with respect to an Injury covered under this Plan, such payments shall be deemed to be made under this Plan by an Employer or shall otherwise be subject to the coordination of benefits provisions of Section 6.1, as determined by the Committee.

5.3    **Claims Procedure.**

(a)    **Filing of Claim:** A claim for benefits under the Plan shall be initiated by or with respect to a Participant by (i) compliance with the reporting requirements set forth in Section 4.1, and (ii) the submission of such Participant to such medical examination or evaluation as may be requested by the Committee.

(b)    **Decision on Claim:** Within 90 days of the receipt of such claim (unless special circumstances require an extension of time for processing the claim), the Committee or its designated representative(s) shall determine and notify the requesting Participant or beneficiary (the "claimant") as to whether he or she is entitled to such benefit. If an extension of time for processing is

- 24 -

© 1999 AFC Enterprises, Inc.

required, written notice of the extension shall be furnished to the claimant prior to the termination of the initial 90-day period. Such written notice shall specify the special circumstances requiring an extension and the date by which a final decision shall be reached (which date shall not be later than 180 days after the date on which the claim was filed).

(c)    **Claim Denial and Request for Review:** Such benefit decision notification shall be in writing and, if denying the claim for benefit, shall set forth the reason or reasons for the denial, make reference to the pertinent provisions of the Plan, describe any additional material or information necessary for the claimant to perfect the claim, explain why such material or information is necessary, and advise the claimant that he or she may, within 60 days of the receipt of such notice, in writing request the Committee or its designated representative(s) to review such denial. In connection with such a request for review, the claimant and/or his or her duly authorized representative may examine any relevant Plan documents and submit issues and comments in writing to support the granting of the benefit being claimed.

(d)    **Decision Upon Review:** The final decision of the Committee with respect to the claim being reviewed shall be made within 60 days following the claimant's request for review (unless special circumstances require an extension of time for processing the claim), and the Committee shall in writing notify the claimant of its final decision, again specifying the reasons therefor and the pertinent provisions of the Plan upon which such decision is based. If special circumstances require an extension of time for processing the review, written notice shall be given specifying such special circumstances and the date by which a final decision shall be reached (which date shall not be later than 120 days after the date on which the request for review was filed). If the decision on review is not made within such 60-day (or 120-day) period, the request for benefits shall be deemed denied.

(e)    **Exhaustion of Administrative Remedies:** No legal action can be brought by or with respect to a Participant to recover benefits under the Plan before the foregoing claims procedure has been exhausted.

5.4    **Professional Medical Review.** The Committee shall have the discretion to assign Physicians and other healthcare personnel or firms to a Participant's case in order to (i) coordinate and expedite medical treatment of the Participant, in consultation with the treating Physician; and (ii) review the propriety of any and all treatment, services, and supplies, including charges for such treatment, services, and supplies.

**ARTICLE VI**

**COORDINATION OF BENEFITS AND SUBROGATION**

6.1    **Coordination Of Benefits.** The benefits payable under the Plan shall be reduced by any amount paid with respect to the Participant's Injury under the Social

- 25 -

© 1999 AFC Enterprises, Inc.

Security Act, the Railroad Retirement Act, any workers' compensation, occupational disease, or similar law, or any other benefit plans, including, but not limited to, a policy or policies of automobile, disability, life, or health insurance purchased by the Participant or an Employer; provided, however, that the benefit reduction under this Plan shall be made only to the extent necessary to ensure that when the benefits under this Plan are added to the benefits of the other plan(s) or insurance coverages, the total amount paid to or with respect to the Participant will not exceed 1 00% of the Covered Charges and 1 00% of the Participant's Pre-injury Pay for any week of coverage under this Plan.  For example, if a Participant is covered under one or more such benefit plans, then (unless otherwise subject to Section 6.2) the medical benefits payable for Covered Charges under Section 3.3 will be either regular benefits or reduced benefits that, when added to the benefits of the other plan(s), will not exceed 100% of the Covered Charges.  In the coordination of benefits, one of the plans (or insurance coverages) will be designated as the primary plan and the other plans (or insurance coverages) will be designated as the secondary plan.  The primary plan will pay its full benefits first, then the secondary plan(s) will pay, but payments will be coordinated so that the total from all plans will not be more than the Covered Charges.  If a person is covered by more than one plan to which this coordination of benefits provision applies, then the following rules will determine which plan will be primary:

(a)    When only one of the plans has a coordination of benefits provision, then the plan without such a provision will be the primary plan;

(b)    If both plans have such a provision, then the plan under which the person is covered as an employee will be the primary plan;

(c)    The provisions of subsection (b) above to the contrary notwithstanding, if both plans have such a coordination of benefits provision and the person is covered as an active employee under one of the plans and a former employee under the other plan, then the plan under which the person is covered as an active employee will be the primary plan;

(d)    If the above rules do not establish an order of benefit determination, and one of the plans is insured and the other plan is self-funded by an Employer (as described in Section 5.2), then the insured plan will be the primary plan; and

(e)    If none of these rules establish an order of benefit determination, then the plan that has covered the Participant for the longer period of time will be the primary plan.

Any provision herein to the contrary notwithstanding, Medical Benefits payable under this Plan to or with respect to any Participant who is not in "current employment status," as defined for purposes of Medicare, and who is eligible for benefits under Medicare, shall be secondary and reduced by the amount of all benefits payable to or with respect to such Participant under Medicare, which will be the primary plan.  Rules similar to all of those set forth above shall apply in order to ensure that the Short-Term Disability Benefits payable under the Plan, when added to the benefits of the other above-

- 26 -

© 1999 AFC Enterprises, Inc.

described plan(s) or insurance coverages, will not exceed 100% of the Participant's Pre-Injury Pay for any week of coverage under this Plan. The Participant must cooperate with the Employer in furnishing to such Employer copies of other policies, coverages or plans which may be applicable to the Injury and in completing and returning to such Employer any questionnaire or forms inquiring about other insurance coverages or plans which may cover or be applicable to such Participant.

6.2    **Recovery From Third Parties And Excess Payments.** If a Participant becomes entitled to or receives Plan benefits for any Injury caused by the negligence or other act or omission of any person or organization, and is (or later becomes) entitled to or otherwise collects any damages or other compensation in connection with such Injury, whether by insurance, litigation, settlement or other proceeding, the Participant shall (i) subrogate his or her right to and reimburse the Plan out of said damages or other compensation to the extent of the Plan benefits paid to the Participant, and (ii) execute any assignment, lien form or other document requested by the Committee to enable the Plan to recover such Plan benefits. If (i) a Participant fails, refuses or neglects to reimburse the Plan or otherwise comply with the provisions of this Section, or (ii) payments are made under the Plan based on fraudulent information or otherwise in excess of the amount necessary to satisfy the provisions of the Plan, then, in addition to all other remedies and rights of recovery that the Plan may have against such Participant, the Plan shall have the right to recover the reimbursement due to the Plan by withholding, offsetting and recovering such amount out of any future Plan benefits or amounts otherwise due from the Plan to or with respect to such Participant. Any reimbursement of Plan benefits obtained by the Plan shall be held in trust and used to provide benefits under the Plan in accordance with the provisions of such trust agreement established by an Employer as may be approved by the Committee.

6.3    **Notice Of Legal Proceedings.** A Participant shall provide the Committee with prior written notice of the involvement of such Participant in any lawsuit, settlement discussion or other proceeding, one of the principal purposes of which is recovering, from any person or organization, damages or other compensation in any way related to any Injury for which such Participant has received (or may in the future file a claim to receive) Plan benefits. The Plan shall have the right to intervene for itself and on behalf of a Participant in any such lawsuit, settlement discussion or other proceeding. If a Participant neglects, fails or refuses to seek a recovery from any person or organization for any Injury caused by the negligence or other act or omission of such person or organization for which such Participant has received Plan benefits, the Plan shall have the right to institute a lawsuit or other proceeding or do any other act that in the opinion of the Committee may be necessary or desirable to recover the Plan benefits paid (and to be paid in the future) to the Participant, plus any costs and expenses incurred by the Plan in pursuing such recovery. Any provision of this Plan to the contrary notwithstanding, the Plan shall have no right to and shall not institute any lawsuit or other proceeding against an Employer to recover for the Plan any Plan benefits paid to or with respect to a Participant.

6.4    **Assignment Of Rights.** Upon the request of the Committee, a Participant shall assign to the Plan the right to intervene in or institute any lawsuit, settlement

- 27 -

© 1999 AFC Enterprises, Inc.

discussion, or other proceeding described in Section 6.3, and to use the name of the Participant for such purpose. The Plan shall have the right to select legal counsel of its own choice and such counsel shall have complete control over the conduct of any such lawsuit, settlement discussion, or other proceeding. Whenever the Plan shall intervene in or institute any lawsuit or other proceeding as permitted by the provisions of this Section, the Plan may pursue same to a final determination and the Plan expressly reserves the right to appeal from any adverse judgment or decision. The Participant shall give the Plan all reasonable aid in any such lawsuit, settlement discussion, or other proceeding in effecting settlement, in securing evidence, in obtaining witnesses, or as may otherwise be requested by the Committee. The Participant shall release the Plan, the Employers, the Committee, and their respective directors, officers, agents, attorneys, and employees from all claims, causes of action, damages and liabilities of whatever kind or character that may directly or indirectly arise out of the pursuit or handling by the Plan of any such lawsuit, settlement discussion or other proceeding.

## ARTICLE VII

## TERMINATION AND AMENDMENT

The Company shall have the right and power at any time and from time to time to amend this Plan, in whole or in part, on behalf of all Employers, and at any time to terminate this Plan or any Employer's participation hereunder; provided, however, that no such amendment or termination shall reduce the amount of any benefit then due and payable to or with respect to a Participant under the Plan in connection with an Injury occurring prior to the date of such amendment or termination. Any such amendment shall be adopted pursuant to formal action of the Company's board of directors and executed by an officer authorized to act on behalf of the Company.

## ARTICLE VIII

## GENERAL PROVISIONS

8.1    **Inability to Make Payment.** In the event an individual becomes entitled to a payment under this Plan and such payment cannot be made (i) because the address provided by the individual is incorrect, (ii) because the individual fails to respond to a notice sent to the address provided by the individual, (iii) because of conflicting claims to such payment, or (iv) because of any other reason, the amount of such payment, if and when made, shall be that determined under the provisions of ARTICLE III without interest thereon. If, within 180 days after any amount becomes payable hereunder to an individual, the same shall not have been claimed, provided the Committee has exercised reasonable diligence in attempting to make such payment, the amount thereof shall be forfeited and shall cease to be a liability of this Plan.

8.2    **Committee Indemnity.** The Employers shall indemnify and hold harmless the Committee and each member thereof against any claim, cost, expense (including reasonable attorneys' fees), judgment or liability (including any sum paid in settlement

- 28 -

© 1999 AFC Enterprises, Inc.

of a claim with the approval of the Company) arising out of any act or omission to act of the Committee or a member thereof under this Plan, except in the case of willful misconduct. The Employers shall be jointly and severally liable for any amounts owed to the Committee or any member thereof pursuant to this Section.

**8.3    Spendthrift Provision.** No right or interest of any Participant or beneficiary under this Plan may be assigned, transferred or alienated, in whole or in part, either directly or by operation of law, and no such right or interest shall be liable for or subject to any debt, obligation or liability of such Participant or beneficiary.

**8.4    Taxation of Benefit Payments.** Benefit payments under this Plan shall be reduced by the amount of any applicable federal or state income, employment, or other taxes which are required by law to be withheld.

**8.5    Employment Noncontractual.** The establishment of this Plan shall not enlarge or otherwise affect an Employee's at will employment by an Employer, and an Employer may terminate the employment of any Employee at any time and/or modify the Employee's working relationship as desired, at will for any or no reason (with or without cause), as freely and with the same effect as if this Plan had not been established.

**8.6    Discharge for Benefit Payments.** If the Committee determines that a Participant is unable to apply a benefit payment under this Plan in furtherance of his or her own interest and advantage, the Committee may direct all or any portion of such payment to be made (i) to the guardian of the person or guardian of the estate of the Participant, (ii) to a relative or friend of the Participant, to be expended for the Participant's benefit, (iii) to a custodian for the Participant under any Uniform Gifts to Minors Act, or (iv) to a trust established for the Participant. The Committee shall not be obliged to see to the proper application or expenditure of any payment so made. Any payment made pursuant to the power herein conferred upon the Committee shall operate as a complete discharge of all obligations of the Plan and the Committee, to the extent of the payments so made.

**8.7    Participation By Affiliates.** With the consent of the Company, any incorporated or unincorporated trade or business which is a member of a control group (within the meaning of Section 3(40) of ERISA) with respect to which the Company is also a member may adopt and become an Employer under this Plan.

**8.8    Plan Documents Control.** This written Plan document constitutes the entire Plan, and no oral or written representation or promise concerning the Plan which is inconsistent with the provisions of this Plan document shall have any effect. The provisions of this Plan document shall be the sole source of all legally enforceable rights with respect to the benefits herein provided.

**8.9    Construction.** The titles to the Articles and the headings of the Sections in this Plan are placed herein for convenience of reference only and in case of any conflict the text of this instrument, rather than such titles or headings, shall control.

- 29 -

© 1999 AFC Enterprises, Inc.

Whenever a noun or pronoun is used in this Plan in plural form and there be only one person or entity within the scope of the word so used, or in singular form and there be more than one person or entity within the scope of the word so used, such word or pronoun shall have a plural or singular meaning as appropriate under the circumstance.

8.10   **Separability.** If for any reason any provision of this Plan is determined to be invalid or contrary to applicable law, such invalidity shall not impair the operation of or otherwise affect the remaining provisions of this Plan.

8.11   **Applicable Law.** This Plan shall be governed and construed in accordance with the provisions of ERISA and, except where superseded by federal law, the laws of the State of Texas.  Proper venue for any court proceeding relating in any way to this Plan shall be in the United States District Court for the Northern District of Texas, Dallas Division.

IN WITNESS WHEREOF, this Plan, as herein amended and restated, has been executed by the Company this ___13th___ day of ___May___ 1999, to be effective June 1, 1999.

AFC ENTERPRISES, INC.

By _____   _CEO_
     (Signature and Title)

© 1999 AFC Enterprises, Inc.

NEW EMPLOYEES

EXHIBIT A                    VALUE DEAL AGREEMENT

Employee recognizes that differences may arise between AFC Enterprises, Inc. ("AFC") and Employee during or following employment with AFC, and that those differences may or may not be related to employment. Employee understands and agrees that any such differences will be resolved by the terms of this Value Deal Agreement ("Agreement").

**OPPORTUNITY FOR INJURY BENEFITS:** AFC has established the AFC Enterprises, Inc. Texas Employee Injury Benefit Plan (the "Plan"). The Plan makes payments to AFC's Texas employees if they are injured while performing their job duties. Covered benefits can include medical, disability and death benefits. Employee agrees that, in exchange for signing this Agreement, Employee will be eligible to receive comprehensive benefits under this Plan. The benefits are explained in a Summary Plan Description which Employee acknowledges he or she has received and read or had the opportunity to read. Also, Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial dispute resolution procedure.

**MUTUAL PROMISES TO RESOLVE CLAIMS BY BINDING ARBITRATION:** In signing this Agreement, both AFC and Employee agree that all claims or disputes covered by this Agreement that cannot be otherwise resolved in accordance with the Employee Handbook must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive remedy for resolving any such claim or dispute. This promise to resolve claims by arbitration is equally binding upon AFC and Employee. Employee acknowledges and understands that by signing this Agreement, he or she is giving up the right to a jury trial on the claims covered by this Agreement. Both AFC and Employee agree that this Agreement binds and benefits their successors, subsidiaries, affiliates, assigns, beneficiaries, heirs, children, spouses, parents and legal representatives.

**CLAIMS COVERED BY THIS AGREEMENT:** Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC or against its subsidiaries, affiliates, officers, directors, shareholders, employees or agents, or any AFC employee benefit program or its fiduciaries, in their personal or official capacity as such, and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation; claims for breach of any contract, covenant or warranty (express or implied); tort claims (including, but not limited to, claims for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment); claims for wrongful termination (including, but not limited to, retaliatory discharge claims under Chapter 451 of the Texas Labor Code); claims for sexual harassment; claims for discrimination (including, but not limited to, claims based on race, sex, religion, national origin, age, medical condition or disability); claims for benefits under the Plan or any other employee benefit program sponsored by AFC (after exhausting administrative remedies under the terms of such plans); claims for a violation of any other federal, state or other governmental law, statute, regulation or ordinance; and any and all claims challenging the validity or enforceability of this Agreement (in whole or in part) or challenging the applicability of this Agreement to a particular dispute or claim.

**CLAIMS NOT SUBJECT TO ARBITRATION:** The following matters are expressly not covered by this Agreement: (1) any criminal complaint or proceedings, and (2) claims for restitution from Employee for a criminal act for which Employee has been found guilty or has pleaded guilty or no contest or nolo contendere. Employee understands and agrees that neither Employee nor AFC has to submit items (1) and (2) above to arbitration under this Agreement and may seek and obtain relief from a court.

**REQUIRED NOTICE OF ALL CLAIMS:** AFC and Employee agree that the party seeking arbitration must give written notice of any claim to the other party within the applicable statute of limitations. Written notice to AFC or its subsidiaries, affiliates, officers, directors, shareholders, employees, agents, benefit program or fiduciaries, will be sent to AFC Enterprises, Inc., c/o Prentice-Hall Corporation, 400 N. St. Paul Street, Dallas, Texas 75201 (or such other person or address as AFC may specify). If AFC wishes to invoke arbitration, it will give written notice to Employee at the last address recorded in Employee's personnel file. This notice shall be sent to the other party by certified, return receipt requested. Neither filing nor serving a lawsuit stops the applicable statute of limitations from continuing to run.

**INCORPORATION OF ARBITRATION PROCEDURES:** The Arbitration Procedures set forth in the Summary Plan Description are incorporated by reference into, and made part of, this Agreement the same as if they were set forth in this

© 1999 AFC Enterprises, Inc.                  White - People Services  Canary - Payroll  Pink - Employee

Agreement at length and in full. This Agreement, together with the incorporated Arbitration Procedures set forth in the Summary Plan Description, is the complete agreement of the parties on the subject of arbitration of disputes. This Agreement takes the place of any other verbal or written understanding on this subject. If any provision of this Agreement is determined to be void or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of the Agreement.

**REPRESENTATION:** Any party may be represented during pre-hearing procedures (as defined in the Summary Plan Description) or at the arbitration hearing by an attorney or other representative selected by the party. If Employee does not participate in the arbitration hearing with an attorney, AFC will also participate in such hearing without an attorney.

**NONBINDING DISPUTE RESOLUTION:** AFC and Employee agree that the arbitration procedures described in this Agreement and in the Summary Plan Description shall not be invoked unless the party seeking arbitration has first utilized the other steps available under the Employee Handbook. The cost of any mediation conducted under the Employee Handbook shall be split evenly between the two sides to the dispute.

**RATIFICATION BY RECEIPT OF PLAN BENEFITS:** Employee agrees that each and every time that Employee receives Plan benefits, or has Plan benefits paid to a medical provider on his or her behalf, Employee ratifies and reaffirms this Agreement the same as if Employee had signed this Agreement again on the date the benefits were paid.

**NOT AN EMPLOYMENT AGREEMENT:** Neither this Agreement, the Plan nor the Summary Plan Description shall be construed to create any contract of employment, express or implied. Nor does this Agreement, the Plan or the Summary Plan Description in any way alter the at-will status of the Employee's employment with AFC.

**VOLUNTARY AGREEMENT:** EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE UNDERSTANDS ITS TERMS AND IS AWARE OF THE CONSEQUENCES OF SIGNING THIS AGREEMENT, AND THAT EMPLOYEE HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY AND WITHOUT DURESS, PRESSURE OR COERCION FROM ANY PERSON AND WITHOUT RELYING ON ANY STATEMENTS, ORAL OR WRITTEN, ON THE SUBJECT, EFFECT, ENFORCEABILITY OR MEANING OF THIS AGREEMENT EXCEPT AS STATED IN THIS AGREEMENT ITSELF. EMPLOYEE ACKNOWLEDGES AND REPRESENTS THAT EMPLOYEE IS NOT UNDER THE INFLUENCE OF ALCOHOL OR ANY OTHER IMPAIRING SUBSTANCE NOR UNDER ANY MENTAL INCAPACITY THAT WOULD AFFECT EMPLOYEE AT THE TIME OF SIGNING THIS AGREEMENT.

**You cannot begin work until this agreement is signed and returned. Have your parent or guardian also sign if you are under age 18 and unmarried.**

X_____

Employee's Signature

X_____     _____

Print Employee Name     Date

X_____

Signature of Parent or Guardian if Employee
Under Age 18 and Unmarried

_____     _____

Print Parent or Guardian's Name and     Date
Relationship to Employee

© 1999 AFC Enterprises, Inc.

# AFC ENTERPRISES, INC.

# TEXAS EMPLOYEE INJURY BENEFIT PLAN

## SUMMARY PLAN DESCRIPTION

© 1999 AFC Enterprises, Inc.

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1
NOTICE TO EMPLOYEES CONCERNING WORKERS' COMPENSATION IN TEXAS ............... 1
ELIGIBILITY FOR PLAN BENEFITS .................................................................... 1
HOW THE PLAN WORKS ..................................................................................... 1
    Procedure In Event Of Injury ......................................................................... 1
    Overview Of Benefits ..................................................................................... 2
    Funding .......................................................................................................... 2
    Excluded Injuries ........................................................................................... 2
SHORT-TERM DISABILITY BENEFITS .................................................................. 3
DEATH BENEFITS .............................................................................................. 4
MEDICAL BENEFITS ........................................................................................... 4
    Covered Medical Services .............................................................................. 4
    Medical Services Not Covered ....................................................................... 5
    Time To Request Payment Or Reimbursement ............................................... 6
    Second Medical Opinions ............................................................................... 6
CONTINUING BENEFITS ...................................................................................... 6
REQUESTING BENEFITS ...................................................................................... 7
    Notice Of Injury ............................................................................................ 7
    Providing Required Information ..................................................................... 7
    Claims For Benefits And How To Appeal A Denial Of Benefits ..................... 8
    Administrative Authority ............................................................................... 8
ARBITRATION PROCEDURES ............................................................................... 8
    General Procedures ........................................................................................ 8
    **Pre-Hearing Procedures** ............................................................................... 9
    **Arbitration Fees and Costs** .......................................................................... 9
    Attorneys' Fees ............................................................................................. 9
    Appeal Procedures ......................................................................................... 9
    Interstate Commerce ..................................................................................... 10
    Requirements for Modification or Revocation ............................................... 10
OFFSET, REIMBURSEMENT, AND RECOVERY OF BENEFITS ................................ 10
    Offset For Other Benefits ............................................................................. 10
    Recovery From Third Parties ......................................................................... 10
    Notice Of Legal Proceedings ........................................................................ 11
    Assignment Of Rights ................................................................................... 11
    Recovery Of Excess Payments ...................................................................... 11
    Right To Receive And Release Necessary Information ................................... 11
AMENDMENT OR TERMINATION OF PLAN ........................................................... 11
DEFINITIONS ..................................................................................................... 11
    Cause ............................................................................................................ 11
    Combined Single Limit .................................................................................. 11
    Committee ..................................................................................................... 11
    Company ....................................................................................................... 12
    Disabled or Disability .................................................................................... 12
    Facility ......................................................................................................... 12
    Injury ........................................................................................................... 12
    Maximum Medical Improvement ................................................................... 13
    Physician ...................................................................................................... 13
    Plan Administrator ........................................................................................ 13
    Pre-Injury Pay .............................................................................................. 13
    Value Deal Agreement ................................................................................... 13
GENERAL INFORMATION .................................................................................... 13
    Type Of Plan ................................................................................................ 13
    Name And Address Of Plan Sponsor ............................................................. 13
    Address Of Plan Administrator ..................................................................... 13
    Name And Address Of Person Designated As Agent For Service Of Legal Process ..... 14
    Employer And Plan Identification Numbers .................................................. 14
    Plan Year ...................................................................................................... 14
YOUR BENEFIT RIGHTS ...................................................................................... 14
EXHIBIT A – Value Deal Agreement

## INTRODUCTION

FC Enterprises, Inc. (the "Company") is committed to providing loss of income protection and helping you pay medical expenses which might otherwise present a financial burden to you if you are injured on the job. To accomplish this, the Company has implemented a benefit program called the AFC ENTERPRISES, INC. TEXAS EMPLOYEE INJURY BENEFIT PLAN (the "Plan"). This Plan covers employees of all divisions of the company, including Churchs Chicken, Popeyes Chicken & Biscuits, Chesapeake Bagel Bakery, Cinnabon and Ultrafryer Systems. This booklet has been prepared to help you understand your benefits under the Plan. Please read it carefully.

If any conflict arises between the information contained in this booklet and the provisions of the formal Plan document, such Plan document will control. Certain terms used herein are capitalized and defined in the DEFINITIONS section of this booklet.

Benefits described in this booklet are effective June 1, 1999. For on-the-job injuries sustained before June 1, 1999, a prior version of the Plan governs any benefits payable.

## NOTICE TO EMPLOYEES
## CONCERNING WORKERS' COMPENSATION IN TEXAS

**The following notice is being provided as required by Texas law:**

COVERAGE: AFC ENTERPRISES, INC. **DOES NOT** have workers' compensation insurance coverage to protect you from damages resulting from work-related illness or injury. However, you may have rights under the common law of Texas. Your employer is required to provide you with coverage information when you are hired or whenever the employer becomes, or ceases to be, covered by workers' compensation insurance.

SAFETY HOTLINE. The Texas Workers' Compensation Commission has established a 24 hour toll-free telephone number for reporting unsafe conditions in the workplace that may violate occupational health and safety laws. Employers are prohibited by law from suspending, terminating, or discriminating against any employee because he or she in good faith reports an alleged occupational health or safety violation. Contact the Division of Workers' Health and Safety at 1-800-452-9595.

**Your Injury Benefit Plan:** AFC ENTERPRISES, INC. **DOES PROVIDE to all Texas employees,** without cost, the Injury Benefit Plan described in this booklet.

**Our Safety Program:** The success of our company largely depends upon you following all of our safety rules and procedures <u>and</u> **immediately notifying your restaurant manager or supervisor <u>first</u>** of any unsafe working condition or injury, no matter how minor. As mentioned above, you will not be suspended, terminated, or discriminated against because you in good faith report an unsafe condition or potential occupational health or safety violation.

## ELIGIBILITY FOR PLAN BENEFITS

You automatically become eligible to participate in the Plan if your employment with the Company is principally located within the State of Texas. You actually become a Participant in the Plan by signing and agreeing to the termsa copy of the Value Deal Agreement and returning it to the Company.

## HOW THE PLAN WORKS

### Procedure In Event Of Injury

- Notify your restaurant manager or supervisor then on duty immediately after being injured at work, <u>no matter how minor the Injury appears to be.</u> **This notice must be provided no later than the end of your workshift for the date of the Injury. If you are a driver or otherwise traveling for the Company, and:**

  - if the Injury occurs during office hours, as soon as you can reach a telephone, call your immediate supervisor, or
  - if the Injury occurs after office hours, call your immediate supervisor as soon as possible and within 24 hours after the accident that caused the Injury.

1

- If necessary, your restaurant manager or supervisor then on duty will assist you in arranging for appropriate medical treatment.

- In order to receive benefits under this Plan, you must receive prompt medical care from a **Physician or Facility approved by the administrative Committee.** You may use a non-approved Physician or Facility only for "Emergency Care" where -

    - transportation to a Physician or Facility is not available, or a Physician or Facility is not within a reasonable distance from your location (taking into account the nature of your Injury), and you provide notice to the Committee of such Emergency Care within the later of 24 hours after you receive such care or the next business day, and
    - after receiving primary Emergency Care, subsequent treatments are provided by or at the direction of a Physician or Facility.
    - For purposes of this Plan, "Emergency Care" means a service or supply provided for a medical condition that arises suddenly and unexpectedly, and is so severe that in the absence of immediate medical attention could reasonably be expected to (i) result in your death, disfigurement, or permanent disability, (ii) place your health in serious jeopardy, or (iii) result in serious impairment to any of your bodily organs, parts or functions.

- Initial medical care may include alcohol and drug testing.

- You must also follow the procedures described below in the REQUESTING BENEFITS section of this booklet.

**Overview Of Benefits**

The Plan provides benefits to you with respect to almost any Injury incurred in the course and scope of your employment by the Company and in furtherance of the business of the Company. Subject to the limitations and exclusions described herein, you may be entitled to receive free medical attention for the Injury. If you miss work due to the Injury, you may receive Short-Term Disability Benefits. If your Injury results in your death, your beneficiaries may receive a Death Benefit.

**MUCH HIGHER LEVELS OF BENEFITS ARE PAYABLE UNDER THE PLAN IF YOU HAVE SIGNED AND AGREED TO THE TERMS OF A "VALUE DEAL AGREEMENT" IN THE FORM ATTACHED TO THIS BOOKLET AS EXHIBIT A.**

**Funding**

The Company currently pays the entire cost to provide your coverage under this Plan. The Company may obtain insurance contracts to provide funds to the Company that can be used by the Company to pay all or any portion of a benefit under the Plan.

**Excluded Injuries**

Although most types of work-related injuries are covered by the Plan, benefits will **not** be payable under the Plan if:

- your employment is not principally located in the State of Texas;

- the Injury occurred while you were in a state of intoxication (which would include, but not be limited to, an alcohol concentration of **0.04** or more, or the presence of any level of a controlled substance), or had otherwise lost the normal use of your mental or physical faculties as a result of the use of a drug or alcohol;

- the Injury was caused by your willful intention or attempt to injure yourself or another person;

- your horseplay, scuffling, fighting, or similar inappropriate behavior was a producing cause of the Injury;

- the Injury was incurred while you were "on suspension" or "laid off";

- the Injury arose out of an act of a third person intended to injure you because of personal reasons and not directed at you as an employee or because of your employment;

2

- the Injury arose out of your voluntary participation in an off-duty recreational, social or athletic activity not constituting part of your work-related duties, except where these activities are expressly covered by a written decision of the President of the Company, as provided in the "Injury" definition below;

- the Injury arose out of an act of God, unless your employment exposes you to a greater risk of Injury from an act of God than ordinarily applies to the general public;

- the alleged Injury is feigned or an attempt to defraud the Company;

- it is determined that the Injury occurred, in whole or in part, in connection with your (1) violation of employment policies or safety rules (including, but not limited to, willful disregard of express direction by an immediate supervisor), or (2) failure to obtain available assistance provided for your benefit to accomplish a particular task or to properly utilize available appropriate equipment or appliances;

- the Injury occurred during commuting travel to or from work for an Employer;

- the Injury arose out of a declared or undeclared act of war, armed invasion, or aggression;

- the Injury arose out of an atomic explosion or other release of nuclear energy (except when nuclear energy is being used solely for medical treatment of an illness), whether in peacetime or at time of war, and whether intended or accidental;

- the Injury arose out of your participation in the commission of any crime;

- you receive benefits with respect to the Injury under any workers' compensation system, occupational disease, or similar law, whether or not any coverage for such benefits is actually in force;

- the Injury is a "preexisting condition" (in other words, an illness, injury, disease or other physical or mental condition which originated or existed prior to the accident);

- you have been untruthful in regard to any aspect of the required information supplied as part of the injury reporting or employment process, particularly with regard to misinformation as to physical or mental abilities to perform the essential functions of the job; or

- you are untruthful or otherwise fail to fully cooperate with the Committee or demonstrate bad faith in connection with the administration of the Plan, including, but not limited to, subrogation or coordination of benefits procedures.

### SHORT-TERM DISABILITY BENEFITS

If you miss work due to a covered Injury, this Plan provides Short-Term Disability Benefits. From the **first day (or the eighth day if you have not signed and agreed to the terms of a Value Deal Agreement)** following the later of (1) the date of your Injury, or (2) the date you become Disabled, the Plan will pay Short-Term Disability Benefits equal to 85% of your Pre-injury Pay **(or 70% of your Pre-injury Pay if you have not signed and agreed to the terms of a Value Deal Agreement)**, minus any earnings you receive from any employer after the Injury.

- Short-Term Disability Benefits are calculated on a weekly basis and paid on regular paydays. Portions of a week will be prorated. Only your normal, scheduled workdays will be considered.

- Short-Term Disability Benefits will continue until the earliest of (1) the expiration of **104 weeks (or 26 weeks if you have not signed and agreed to the terms of a Value Deal Agreement)** from the time such benefits began, (2) the date you are released by the treating Physician to return to work, whether to the same duty as before you became Disabled or transitional duty and without regard to whether you actually return to work on that date, (3) the date that the Combined Single Limit is met, (4) termination of all your employment with the Company, or (5) the date that the attending Physician determines that you have reached Maximum Medical Improvement.

Transitional duty work is those functions of your job which you are able to perform in accordance with the AFC Enterprises, Inc. Transitional Return-To-Work Program.

## DEATH BENEFITS

If you die as the direct and sole result of, and within 365 days of, an Injury, **and you have signed and agreed to the terms of a Value Deal Agreement,** then the Plan will pay your beneficiary (as identified under the Plan) a Death Benefit equal to two times your annualized Pre-Injury Pay (such dollar amount is called the "Principal Sum"). The Principal Sum will be reduced to the extent necessary to avoid exceeding the **Combined Single Limit.** The Death Benefit will be paid to your beneficiary as follows: (i) 20% will be paid in a lump sum cash payment as soon as possible following your death; and (ii) the remainder will be paid in 59 equal monthly installments (without interest). Death Benefits will be in addition to Short-Term Disability Benefits and Medical Benefits payable with respect to any one accident; provided, however, that the **Combined Single Limit** will not be exceeded.

## MEDICAL BENEFITS

The Company is committed to providing comprehensive medical attention to help protect you against the financial hardship that may be caused by a covered Injury.

### Covered Medical Services

The following medical services and supplies are covered at 100%, provided that (1) you follow the "Procedure in Event of Injury" described above, and (2) such expenses do not exceed the **Combined Single Limit.** Medical benefits will cease upon the earliest of (1) **104 weeks (or 26 weeks if you have not signed and agreed to the terms of a Value Deal Agreement)** from the date of your Injury, (2) termination for Cause of all your employment with the Company, or (3) the date the attending Physician determines that you have reached Maximum Medical Improvement. The first covered charge must be incurred within 30 days following the date of Injury.

- Physician visits - at a Facility, Physician's office or, in the case of home health care, at your home, including second opinion services requested by the Committee;

  Medical supplies, including the following:

  - Prescription drugs (generic unless trade name drugs are requested by a Physician);
  - Blood and other fluids (other than allergy, insulin, and similar drugs) injected into the circulatory system; Oxygen and its administration;
  - Upon the written advice or prescription of a Physician, rental or purchase of a wheelchair, iron lung, or other mechanical equipment necessary for the treatment of respiratory paralysis, and similar internal or external durable medical equipment designed primarily for therapeutic purposes;
  - Surgical dressings, bandages, splints, casts, crutches, syringes, needles, artificial limbs and eyes, trusses, braces, prostheses, special bras and girdles dispensed by a Physician; and
  - Other items according to guidelines approved by the Committee as medically necessary;

- Outpatient services and supplies, including ambulatory day surgery, x-ray examinations, laboratory tests, diagnostic services, and nuclear medicine;

- Occupational and physical therapy provided by a Physician or a licensed occupational therapist or licensed physical therapist; provided, however, that such services (and any provider of such services) must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services will be subject to case management approval regarding the number of visits and the types and amount of services provided during such visits;

- Inpatient rehabilitation services provided in an approved medical rehabilitation hospital; provided, however, that such services must be approved in advance and in writing by the Committee and recommended by the attending Physician; and provided, further, that such services will be subject to continued stay review by the Committee and case management approval regarding the types and amount of services provided;

  Room and board (semi-private) as an inpatient at a Facility;

- Home health care (with respect to physical needs only) up to 75 visits per Plan Year and up to eight hours per visit for the first two weeks of home health care and up to four hours per visit thereafter;

- Skilled nursing care, provided that a Physician monitors the progress of the Participant at least once during each 30-day period of confinement;

- Blood and blood plasma (but only to the extent not available through any refund or allowance by a blood bank or similar organization);

- Anesthesia and its administration;

- Radiology and pathology, including interpretive services of a Physician;

- Ambulance services - professional ground ambulance service or, if no other means of transportation can reasonably suffice for delivery to the closest appropriate Facility, air ambulance, regularly scheduled railroad, or airlines;

- Surgery, including surgery which restores a reasonable, normal functioning, but excluding any services or supplies related to any of the following: a prior cosmetic surgery; surgical excision or reformation of any sagging skin on any part of the body such as the eyelids, face, neck, abdomen, arms, legs, or buttocks; any services performed in connection with the enlargement, reduction, or change in appearance of a portion of the body such as the breasts, lips, jaw, chin, nose, ears, or genitals; hair transplantation; chemical face peels or abrasions of the skin;

- Services of licensed oral surgeons - services for treatment of fractures and dislocations of the jaw or the replacement of sound natural teeth (excluding temporomandibular junction dysfunction services) when treatment is sought within 72 hours after the Injury;

- Eyeglasses or contact lenses - one pair per Injury up to $125, inclusive of professional office visit charges;

- External hearing aid - up to $600 per year, inclusive of professional office visit charges;

- Orthotics, arch supports, corrective shoes, corrective appliances, or any similar item, if approved in advance and in writing by the Committee;

- Organ and tissue transplant services, including kidney, heart, heart/lung, liver, pancreas, and bone marrow, excluding transportation costs, organ procurement costs and the live donor's surgical expenses; and

- Mental health services, but only if provided for mental or emotional damage or harm resulting from you being the victim of or witness to a crime while you are at work. Any such services must be approved in advance and in writing by the Committee.

## Medical Services Not Covered

While the Plan provides benefits for many medical expenses, the following expenses are **not** covered by the Plan:

- Charges incurred prior to your date of participation in the Plan, or prior to your date of Injury;

- Charges rendered after your Medical Benefits under this Plan terminate;

- Expenses which are not medically necessary, as determined by the Committee;

- Charges incurred more than 60 days after the date of the last covered charge;

- Expenses that exceed any fee schedule adopted by the Committee or the usual, customary and reasonable charge for the same or similar services or supplies in your geographic area;

- Services or supplies payable by any government or subdivision or agency thereof;

- Services or supplies which are experimental, investigative, or for the purposes of research;

- Services or supplies performed or provided while you are not covered by the Plan;

- Services or supplies for which you are not legally obligated to pay or for which no charge would be made in the absence of the Plan;

- Services or supplies for personal comfort or convenience, such as a private room, television, telephone, radio, guest trays, and similar items;

- Fraudulent claims or claims not filed in good faith as determined by the Committee;

- Canceled appointment charges;

- Self-administered services;

- Services in which your condition is persistently nonresponsive to treatment;

- Services or supplies relating to pre-existing conditions;

- Acupuncture, behavior modification, or biofeedback;

- Services rendered primarily for training, testing, evaluation, counseling, or educational purposes, except to the extent approved in advance and in writing by the Committee;

- Chiropractic or spinal manipulation services, except to the extent approved in advance and in writing by the Committee and recommended by the treating Physician;

- Substance abuse services;

- Services and supplies provided in or out of a rest home, convalescent facility, nursing home, or other institution that only assist with activities of daily living such as bathing, dressing, walking, eating, preparing special diets, or the supervision of taking medications, no matter by whom recommended or furnished;

- Any travel or lodging expenses that are not incurred pursuant to the direction of a Physician and approved in advance and in writing by the Committee; or

- The cost of any other service or supply not specified above as a covered charge.

**Time To Request Payment Or Reimbursement**

All requests for payment or reimbursement of covered charges must be filed with the Committee or its designated representative within 30 days from the date such expenses are incurred or, if later, the date you receive an invoice for such expenses.

**Second Medical Opinions**

The Plan reserves the right to require a second medical opinion from a Physician selected by the Committee. If you refuse to be examined by a Physician selected by the Committee for the second opinion, all benefits under the Plan will be suspended. The Committee will weigh the findings of the treating Physician and the Physician providing the second opinion and make a benefit determination under 'the Plan. However, if you disagree with the diagnosis or treatment recommended by the Physician whose opinion is accepted by the Committee (the "Committee's Physician"), then you will have the right to be examined at your own expense by another Physician (the "Participant's Physician"). If the diagnosis and treatment recommended by the Participant's Physician is contrary to that of the Committee's Physician, then you must be examined by another Physician selected by the Committee's Physician and the Participant's Physician. If you refuse to be so examined, all benefits under the Plan will be suspended. The diagnosis and recommended treatment of this last Physician will be controlling. Such Physician's fees and related expenses will be shared equally by the Plan and you.

**CONTINUING BENEFITS**

Subject to the limitations and other rules and procedures described in this booklet, your benefits under this Plan will begin or continue as long as you —

© 1999 AFC Enterprises, Inc.

- submit to any drug and alcohol testing requested by the Committee, the treating Physician or the Emergency Care provider;

- provide a complete statement, affidavit, or deposition upon request by the Committee concerning the incident that you believe resulted in an Injury;

- utilize only approved Physicians and Facilities (except in the case of Emergency Care when it is not practicable to use an approved Physician or Facility and you notify the Committee of your receipt of other medical care within 24 hours);

- follow the directions and continue to be under the care of a treating Physician; keep all scheduled appointments with health care providers;

- do not engage in conduct which hinders your recovery;

- report in to your restaurant manager or supervisor then on duty periodically as directed until you are able to return to work, including notice of expected recovery time after each appointment with the treating Physician;

- are not terminated for Cause from employment with the Company;

- personally pick up your check for Short-Term Disability benefits provided under the Plan; provided, that this requirement may be waived by the Committee upon a showing that you are physically or geographically unable to pick up your benefit check;

- comply with the provisions of this summary plan description, the Plan, and the rules and procedures adopted by the Committee for the administration of the Plan;

- return to work for the Company after being released by the treating Physician, and being scheduled, to do so;

- do not demonstrate bad faith or abuses of this Plan as determined in the discretion of the Committee;

- report to the Company immediately after being informed that you have reached Maximum Medical Improvement;

- permit an authorized representative of the Plan to accompany you to appointments with Physicians; and

- neither you, your Beneficiary, spouse, child, heir, parent, sibling or legal representative bring a lawsuit in violation of a Value Deal Agreement that you signed and agreed to.

## REQUESTING BENEFITS

### Notice of Injury

You (or a person acting on your behalf) must notify your restaurant manager or supervisor then on duty of an Injury **immediately**, no matter how minor the Injury appears to be. **This notice must be provided no later than the end of the workshift for the date of the Injury. If you are a driver or otherwise traveling for the Company, and:**

- if the Injury occurs during office hours, as soon as you can reach a telephone, call your immediate supervisor, or

- if the Injury occurs after office hours, call your immediate supervisor as soon as possible and within 24 hours after the accident that caused the Injury.

### Providing Required Information

You (or a person acting on your behalf) and your restaurant manager or your supervisor then on duty (or such other person as the Committee may specify) must complete such Injury report forms, file such written statements, and provide such proof and demonstrations, in such manner and within such periods, as the Committee may from time-to-time direct. **All such information must be provided (if possible) by the end of the workshift for the date of the Injury, and not later than three days following the date of the Injury.**

7

© 1999 AEC Enterprises, Inc.

An immediate report to your immediate supervisor is essential so that the facts regarding your Injury can be promptly verified by the Committee and appropriate benefits can be paid. No benefits will be payable under the Plan if:

notice is not provided as required above, unless (1) your restaurant manager or immediate supervisor then on duty has actual knowledge of the Injury, or (2) the Committee determines that good cause exists for failure to give notice in a timely manner; or

• all required information is not provided as required above, unless the Committee determines that good cause exists for failure to provide such information in a complete and timely manner.

## Claims For Benefits And How To Appeal A Denial Of Benefits

You can make a claim for benefits under the Plan **by** (i) complying with the reporting requirements set forth above, and (ii) submitting to such medical examination or evaluation as may be requested by the Committee. If you believe a request for **benefits** has been improperly denied, a written request for the review of such denial may be submitted to the Committee or its designated representative within 60 days of the response to you on the claim for benefits. The request should state, in clear and concise terms, the reason for disagreement with the way the request for benefits was processed. When the written request for review is received, the request for benefits will be reviewed again and the results of this review will be finished in writing to you within 60 days in most cases.

## Administrative Authority

The Committee has, discretionary and final authority: to interpret and implement the provisions of the Plan. Every interpretation, choice, determination, or other exercise of authority by the Committee will be binding upon all affected parties, without restriction, however, on the right of the Committee to reconsider and redetermine such action. The Committee may also adopt any rules and procedures it deems necessary or appropriate for the administration of the Plan. The Committee may deny a claim for or suspend the payment of Plan benefits otherwise payable to you if you do not comply with any provision of the Plan or the rules and procedures adopted by the Committee.

## ARBITRATION PROCEDURES

**The following procedures are incorporated by reference into, and made part of, the Value Deal Agreement, just as if they were set forth at length in the Value Deal Agreement itself, and apply both to the Employee and AFC.**

## GENERAL PROCEDURES:

(a)    AFC and Employee agree that the arbitration hearing will be conducted by one arbitrator under the American Arbitration Association's National Rules for the Resolution of Employment Disputes (as amended or revised from time to time by the American Arbitration Association (hereinafter the "American Arbitration Association Rules"), before one arbitrator from the American Arbitration Association (hereinafter the "hearing arbitrator"). AFC and Employee recognize that the American Arbitration Association Rules and the terms and procedures set forth here in this summary plan description and incorporated by reference into the Value Deal Agreement may conflict on certain issues and agree that that to the extent that the procedures set forth here and in the Value Deal Agreement conflict with the American Arbitration Association Rules, the procedures set forth here and in the Value Deal Agreement shall control and be applied by the hearing arbitrator and the appellate arbitrators (defined below).

(b)    The hearing arbitrator shall apply the substantive law (and the law of remedies, if applicable), in the state in which the claim arose, or federal law, or both, depending upon the claims asserted. The hearing arbitrator shall also strictly apply the Federal Rules of Evidence, except that deposition testimony of a witness may be used at the arbitration hearing without regard to whether the witness is unavailable. The hearing arbitrator shall provide brief findings of fact and conclusions of law. All arbitration decisions and awards rendered pursuant to the Value Deal Agreement shall be kept strictly confidential and shall not be disclosed to anyone not a witness, attorney, party representative, or party who actually attended the arbitration hearing.

(c)    The hearing arbitrator shall have jurisdiction to hear and rule on prehearing disputes and is authorized to hold prehearing conferences by telephone or in person as the arbitrator deems necessary. The hearing arbitrator will have the authority to hear a motion to dismiss and/or a motion for summary judgment by any party and in doing so shall apply the standards governing such motions under the Federal Rules of Civil Procedure. The hearing arbitrator shall

dismiss any claim for arbitration where the person or party seeking arbitration has not first mediated the dispute with the other party or parties.

**Pre-Hearing Procedures:** Each party will have the right to take the deposition of one individual and any expert witness designated by another party. Each party will have the right to subpoena witnesses in accordance with the Federal Arbitration Act, Title 9 of the United States Code. Additional discovery may be had only where the hearing arbitrator so orders, upon a showing of substantial need. At least 30 days before the arbitration, the parties must exchange lists of witnesses, including any experts, and copies of all exhibits intended to be used at the arbitration hearing.

**Arbitration Fees and Costs:** AFC and Employee acknowledge that there will be fees and expenses associated with an arbitration hearing under the Value Deal Agreement for the hearing arbitrator's services. The parties agree that the fees and expenses of the hearing arbitrator shall be shared equally by AFC and Employee; provided, however, that Employee will not be required to pay more than $350.00 of such fees and expenses. Each party shall deposit funds or post other appropriate security for its share of the hearing arbitrator's fees, in an amount and manner determined by the hearing arbitrator or American Arbitration Association, at least ten days before the first day of the arbitration hearing. Either party, at its expense, may arrange for and pay the cost of a court reporter to provide a stenographic record of the proceedings at the hearing.

**Attorneys' Fees:** AFC and Employee further agree as follows:

(a)   Each party shall be responsible for their own attorney's fees, if any; however, if any party prevails on a statutory claim which allows the winning party to be awarded attorney's fees, or if there is a written agreement providing for fees, the hearing arbitrator shall award reasonable fees to the prevailing party. The hearing arbitrator shall determine the prevailing party in accordance with the meaning of "prevailing party" under the Civil Rights Attorney's Fees Awards Act of 1976.

(b)   The hearing arbitrator shall assess attorney's fees against a party upon a showing that such party's claim, defense or position is frivolous, or unreasonable, or factually groundless.

(c)   If either party pursues a claim covered by this Agreement by any means other than those set forth in this Agreement, the responding party shall be entitled to dismissal of such action, and the recovery of all costs and attorney's fees and losses related to such action.

**Appeal Procedures:** AFC and Employee further agree as follows:

(a)   Any party may appeal any arbitration award that has been rendered and become final under the American Arbitration Association Rules. The written appeal must be served in writing on the other party or parties to the arbitration and on the American Arbitration Association by certified mail within thirty (30) days after the hearing arbitrator caused the arbitration award to be mailed to the parties or to their representatives. The writing evidencing the appeal must specify those elements of the arbitration award that are being appealed and must contain a short statement of the appeal's basis. Once an appeal is timely served, the arbitration award by the hearing arbitrator shall no longer be considered final for purposes of seeking judicial enforcement, modification or vacation under the Federal Arbitration Act.

(b)   Within fifteen (15) days after receipt of the appeal, the other party or parties may serve a written cross-appeal by serving it by certified mail on the other party or parties to the arbitration and on the American Arbitration Association. The writing evidencing the cross-appeal must specify those elements of the arbitration award that are being appealed and must contain a short statement of the cross-appeal's basis. Once a cross-appeal is timely served, the arbitration award by the hearing arbitrator shall no longer be considered final for purposes of seeking judicial enforcement, modification or vacation under the Federal Arbitration Act, even if the appeal is subsequently withdrawn.

(c)   Within forty-five (45) days after receipt of the appeal, the parties to the appeal shall select a panel of three arbitrators (hereinafter the "appellate arbitrators") utilizing the procedures to select arbitrators set forth in the American Arbitration Association Rules. The hearing arbitrator shall not be eligible to serve as an appellate arbitrator.

(d)   The fees and expenses of the appellate arbitrators shall be shared equally if both an appeal and a cross-appeal are served. If only an appeal is served, the fees and expenses of the appellate arbitrators shall be paid by the appellant party (or parties). Each party serving an appeal or cross-appeal shall deposit funds or post other appropriate security for the appellate arbitrators' fees, in an amount and manner determined by the American Arbitration Association,

within thirty (30) days after that party's service of an appeal or cross-appeal or when so directed by the American Arbitration Association.

(e)      The record on appeal to the appellate arbitrators shall consist of any stenographic record or other record of the hearing before the hearing arbitrator and shall include all exhibits and deposition transcripts admitted into the record by the hearing arbitrator. The parties to an appeal shall assist and cooperate with the American Arbitration Association in providing the record, exhibits and deposition transcripts to the appellate arbitrators.

(f)      The appellate arbitrators shall establish a briefing schedule, page limitations for briefs and a date and duration for oral argument; provided, however, that prior to the appellate arbitrators' rulings on these subjects, the parties to the appeal may agree to waive briefing and/or oral argument and may agree to their own page limitations for briefs.

(g)      The appellate arbitrators shall apply the same standard of review as the first-level appellate court would apply to the cause of action or defense on appeal in similar circumstances. If both federal and state-law causes of action (and/or defenses) are before the appellate arbitrators (either in a single appeal or as the result of a cross-appeal), the appellate arbitrators shall apply only the standards of review utilized by the United States Court of Appeals for the Fifth Circuit in similar circumstances.

(h)      By majority vote, the appellate arbitrators may affirm, reverse, render or modify an arbitration award. The appellate arbitrators may remand, but they may not remand to the original hearing arbitrator. In the event of a remand, the parties shall select a new hearing arbitrator under the procedures set forth in the American Arbitration Association Rules, and the fees and expenses of the new hearing arbitrator shall be shared equally by the parties to the re-hearing. The appellate arbitrators' decision shall include a brief, written opinion addressing the issues before them, and such opinion shall be delivered to the parties and the American Arbitration Association within thirty (30) days after the conclusion of any briefing schedule or any oral argument or as the parties may agree. Fifteen (15) days after receipt of the appellate arbitrators' opinion setting forth their decision, any award by them shall be considered final for purposes of judicial enforcement, modification or vacation under the Federal Arbitration Act.

INTERSTATE COMMERCE: Employee understands and agrees that AFC, a Minnesota corporation headquartered in Atlanta, Georgia, is involved in transactions involving interstate commerce (e.g., purchasing goods and services from outside Texas which are shipped to Texas; operating offices and restaurants in multiple states; and serving customers traveling interstate) and that Employee's employment and participation in the Plan involve such commerce. The Federal Arbitration Act, Title 9 of the United States Code, shall govern the interpretation, enforcement, and all judicial proceedings under and/or with respect to this Agreement.

REQUIREMENTS FOR MODIFICATION OR REVOCATION: This Agreement to arbitrate will survive the termination of Employee's employment. It can only be revoked or modified by mutual consent evidenced by a writing signed by both parties which specifically states an intent to revoke or modify this Agreement. However, AFC retains the right to unilaterally modify, change, or delete any of the provisions of the Employee Handbook, except for those provisions addressing binding arbitration.

## OFFSET, REIMBURSEMENT, AND RECOVERY OF BENEFITS

### Offset For Other Benefits

Any benefits payable under this Plan will be reduced by any Social Security payments, Railroad Retirement Act benefits, workers' compensation, occupational disease, or similar benefits provided under a statutory law or government benefit program, and certain amounts paid or payable under other forms of insurance or employee benefit plans, as a result of your Injury.

### Recovery From Third Parties

If you become entitled to or receive benefits under the Plan for any Injury caused by another person or organization and become entitled to or otherwise collect any other compensation in connection with such Injury, whether by insurance, litigation, settlement or other proceeding, you must (1) reimburse the Plan out of such other compensation to the extent of any Plan benefits that you have received, and (2) execute any documents requested by the Committee to enable the Plan to recover such benefits. If you do not reimburse the Plan, then reimbursement may be obtained out of any future benefits or amounts otherwise payable to you by the Plan.

© 1999 AFC Enterprises, Inc.

## Notice of Legal Proceedings

You must provide the Committee with prior written notice of your involvement in any lawsuit, settlement discussion or other proceeding aimed at recovering, from another person or organization, compensation related to any Injury for which you have received (or may in the future file a claim to receive) benefits under the Plan. The Plan will have the right to intervene in any such lawsuit, settlement discussion or other proceeding. If you do not seek recovery from any person or organization that has caused your Injury, the Plan will have the right to begin a lawsuit or other proceeding or do any other act that in the opinion of the Committee may be necessary or desirable to recover Plan benefits paid or to be paid in the future (including costs and expenses).

## Assignment of Rights

Upon the request of the Committee, you must assign to the Plan the right to begin or intervene in any lawsuit, settlement discussion or other proceeding described above, and to use your name for that purpose. The Plan will have all of the rights and privileges with respect to any such proceeding (such as the right to select legal counsel or pursue appeals) that you would have. You must provide all reasonable aid in any such proceeding as requested by the Committee. You must also release the Plan, the Company, the Committee and their representatives from any claims that may arise out of the pursuit or handling by the Plan of any such lawsuit, settlement discussion or other proceeding.

## Recovery of Excess Payments

Whenever payments are made under the Plan based on fraudulent information or otherwise in excess of the amount necessary to satisfy the provisions of the Plan, the Plan may recover these excess payments out of any future benefits or amounts otherwise payable to you by the Plan.

## Right To Receive And Release Necessary Information

The Committee may, without the consent of or notice to any- person or organization, release to or obtain from any person or organization, information needed to implement Plan provisions. When you request benefits, you must furnish all information requested by the Committee.

## AMENDMENT OR TERMINATION OF PLAN

The Company presently intends to continue the Plan indefinitely. However, the Company reserves the right to amend, modify, or terminate the Plan at any time. Any such amendment will be adopted pursuant to formal action of the Company's board of directors and executed by an officer authorized to act on behalf of the Company. No amendment or termination of the Plan will reduce the amount of any benefit then due and payable under the Plan to or with respect to a participant in connection with an Injury occurring prior to the date of such amendment or termination.

## DEFINITIONS

This section defines specific terms used in this booklet. These definitions should not be interpreted to extend coverage unless specifically provided for in the other sections of this booklet and the Plan document.

## Cause

The employee's gross misconduct within the meaning of Section 4980B of the Internal Revenue Code, as informed by interpretations and decisions under Section 201.012 of the Texas Labor Code.

## Combined Single Limit

The maximum amount of all benefits payable to you under the Plan with respect to an accident. Payments made for each form of benefit will be counted towards the Combined Single Limit amount. **If you have signed a Value Deal Agreement,** the Combined Single Limit will be $75,000. **If you have not signed a Value Deal Agreement,** the Combined Single Limit be $25,000. However, a lesser limit may apply if more than one person is injured in the same accident.

## Committee

The committee of individuals appointed by the Company to administer the Plan.

11

© 1999 AFC Enterprises, Inc.

**Company**

C Enterprises, Inc.

**Disabled or Disability**

Inability, commencing within 90 days from the date of the accident causing the Injury, to attend to the material duties normally performed by you for the Company because of an Injury.

**Facility**

A hospital or other medical care facility either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a participant. **No Facility is an agent of the Company. Although benefits under this Plan are conditioned on your use of only approved Physicians and Facilities, you remain entitled to seek any medical care you deem appropriate from any provider of your choice at your own expense.**

**Injury**

Damage or harm to the physical structure of the body which is incurred (1) solely as the result of, a sudden, unexpected, unusual, specific event which occurs at an identifiable time and place, and independently of any other cause, (2) on or after June 1, 1999, (3) in the course and scope of employment by the Company, and (4) in the furtherance of the business of the Company. The term "Injury" also includes damage or harm incurred solely as a result of on-site participation in "Habitat For Humanity" or "Day of Dreams" programs sponsored by the Company or other program specifically covered by written decision of the President of the Company, and independently of any other cause. All Injuries resulting from or arising out of a single accident will be considered a single Injury for purposes of all benefit limitations under the Plan. The term Injury does not include:

> Any damage or harm to, or disease or infection of, the eye or musculoskeletal structure resulting from use of a video display terminal, poor or inappropriate -posture, or similar circumstances prescribed by the Committee which are of a chronic nature;

- Any asbestos-related poisoning or disease;

- Except as otherwise provided under the "Covered Medical Services," any mental injury emotional distress, mental trauma or similar injury, including, without limitation, any mental or emotional damage or harm that arises primarily from a legitimate personnel action, including a transfer, promotion, demotion or termination of employment;

- Any illness or disease, howsoever acquired and whatsoever named;

- Damage or harm to the physical structure of the body, such as carpel tunnel syndrome, occurring as the result of repetitious, physically traumatic activities that occur over time; _____

- Ptomaine or bacterial infection, except when resulting from accidental ingestion or accidental inhalation of poisonous food substances, and except pyogenic infection which occurs with and as a result of an accidental cut or wound;

- A heart attack, stroke, or aneurysm, except in limited circumstances prescribed by the Plan; and

- Hernia, unless inguinal hernia that -

  - appeared suddenly and immediately following the Injury;
  - did not exist in any degree prior to the Injury;
  - and was accompanied by pain.

**With regard to recurring disabilities:** If you suffer a Disability due to an Injury, are certified by the treating Physician as able to return to work (whether or not you actually return to work), and again become Disabled as a result of the same Injury, then the subsequent period of Disability will be considered part of the prior period of Disability for purposes of

12

applying any applicable limitation on benefits, unless the subsequent period of Disability results from an Injury sustained in a separate accident.

### Maximum Medical Improvement

The point when the attending Physician determines that the Participant with an Injury will not improve substantially as a result of additional medical treatment or physical therapy.

### Physician

A person duly licensed under Texas law as a Medical Doctor or Doctor of Osteopathy and either preapproved by the Committee or otherwise approved in writing by the Committee upon the request of a participant. No Physician is an **agent of the Company. Although benefits under this Plan are conditioned on your use of only approved Physicians and Facilities, you remain entitled to seek any medical care you deem appropriate from any provider of your choice at your own expense.**

### Plan Administrator

The Company is the plan administrator of the Plan. The Plan is administered on behalf of the Company by the Committee.

### Pre-Injury Pay

- For a salaried participant, regular weekly salary from the Company as of the date he or she becomes Disabled; and
- For an hourly participant, the average regular straight-time rate of pay for the four consecutive weeks immediately preceding the date the Disability begins; provided, however, that if an hourly employee has worked for the Company for fewer than four weeks immediately preceding the date the Disability begins, or if such four consecutive week period included any vacation time, sick leave, or other approved leave of absence, or if his or her earnings as of such date have not been fixed or cannot otherwise be reasonably determined (in the judgment of the Committee), such four-week average will be based upon the earnings received over such period by a similar employee of the Company.

"Pre-injury Pay" **does not include** any bonuses, overtime, commissions, benefits or other extraordinary remuneration. "Pre-injury Pay" **does include** amounts excludable from your gross income which are contributed by your employer, at your election, to a 401(k) arrangement or cafeteria plan.

### Value Deal Agreement

A written agreement between you and the Company, agreeing to resolve all disputes in accordance with the Value Deal Program. See Exhibit A attached hereto. Higher benefits are payable under the Plan only if a signed, agreed Value Deal Agreement is in full force and effect as of the date of the Injury and the date of benefit payment.

## GENERAL INFORMATION

### Type Of Plan

A welfare benefit plan providing short-term disability, death and medical benefits due to an Injury.

### Name And Address Of Plan Sponsor

AFC Enterprises, Inc.
Six Concourse Parkway, Suite 1700
Atlanta, GA 30328-5352

### Address Of Plan Administrator

Any questions you may have about the Plan may be posed to the Plan Administrator by mail, c/o Ms. Louisa Browne, AFC Enterprises, Inc., Six Concourse Parkway, Suite 1700, Atlanta, GA 30328-5352, or by telephone at (770) 391-9500.

© 1999 AFC Enterprises, Inc.

**Name And Address Of Person Designated As Agent For Service Of Legal Process**

Prentice-Hall Corporation
800 Brazos
Austin, Texas 78701

**Employer And Plan Identification Numbers**

The employer identification number assigned by the Internal Revenue Service to the Company is 58-2016606. The plan number of the Plan is 502.

**Plan Year**

The Plan operates and keeps its records on the basis of the 12-month period ending each December 31.

<h2 style="text-align:center">YOUR BENEFIT RIGHTS</h2>

As a participant in the Plan, you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 ("ERISA"). ERISA provides that all Plan participants shall be entitled to:

- Examine, without charge, at the Plan Administrators office and at other specified locations (such as work sites) all Plan documents, including insurance contracts, and copies of all documents filed by the Plan with the U.S. Department of Labor, such as detailed annual reports and Plan descriptions.

- Obtain copies of all Plan documents and other Plan information upon written request to the Plan Administrator. The administrator may charge a reasonable fee for the copies.

- Receive a summary of the Plan's annual financial report, unless the Company is not required to file such a report with the Internal Revenue Service.

In addition to creating rights for Plan participants, ERISA imposes duties upon the people who are responsible for the operation of the Plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including the Company, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising your rights under ERISA,

If your claim for a benefit is denied in whole or in part you must receive a written explanation of the reason for the denial. You have the right to have the Plan review and reconsider your claim.

Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court (unless you have signed a Value Deal Agreement, which can provide a similar final and binding resolution through arbitration). In such a case, the court (or arbitrator) may require the Plan Administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the Plan Administrator.

If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court (unless you have signed a Value Deal Agreement, which can provide a similar final and binding resolution through arbitration). If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court (or request arbitration). The court (or arbitrator) will decide who should pay court costs and legal fees.

If you are successful, the court (or arbitrator) may order the person you have sued to pay these costs and fees. If you lose, the court (or arbitrator) may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan Administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

June 1, 1999

© 1999 AFC Enterprises, Inc.

NEW EMPLOYEES

## EXHIBIT A                    VALUE DEAL AGREEMENT

Employee recognizes that differences may arise between AFC Enterprises, Inc. ("AFC") and Employee during or following employment with AFC, and that those differences may or may not be related to employment. Employee understands and agrees that any such differences will be resolved by the terms of this Value Deal Agreement ("Agreement").

**OPPORTUNITY FOR INJURY BENEFITS:** AFC has established the AFC Enterprises, Inc. Texas Employee Injury Benefit Plan (the "Plan"). The Plan makes payments to AFC's Texas employees if they are injured while performing their job duties. Covered benefits can include medical, disability and death benefits. Employee agrees that, in exchange for signing this Agreement, Employee will be eligible to receive comprehensive benefits under this Plan. The benefits are explained in a Summary Plan Description which Employee acknowledges he or she has received and read or had the opportunity to read. Also, Employee understands and agrees that by entering into this Agreement, Employee anticipates gaining the benefits of a speedy, impartial dispute resolution procedure.

**MUTUAL PROMISES TO RESOLVE CLAIMS BY BINDING ARBITRATION:** In signing this Agreement, both AFC and Employee agree that all claims or disputes covered by this Agreement that cannot be otherwise resolved in accordance with the Employee Handbook must be submitted to binding arbitration and that this binding arbitration will be the sole and exclusive remedy for resolving any such claim or dispute. This promise to resolve claims by arbitration is equally binding upon AFC and Employee. Employee acknowledges and understands that by signing this Agreement, he or she is giving up the right to a jury trial on the claims covered by this Agreement. Both AFC and Employee agree that this Agreement binds and benefits their successors, subsidiaries, affiliates, assigns, beneficiaries, heirs, children, spouses, parents and legal representatives.

**CLAIMS COVERED BY THIS AGREEMENT:** Claims and disputes covered by this Agreement include all claims and disputes Employee may presently have or may in the future have against AFC or against its subsidiaries, affiliates, officers, directors, shareholders, employees or agents, or any AFC employee benefit program or its fiduciaries, in their personal or official capacity as such, and all claims that AFC may presently have or may in the future have against Employee, whether or not arising out of Employee's employment or termination. The claims covered by this Agreement include, but are not limited to, claims for wages or other compensation; claims for breach of any contract, covenant or warranty (express or implied); tort claims (including, but not limited to, claims for bodily injury or physical, mental or psychological injury, without regard to whether such injury was sustained in the course and scope of Employee's employment); claims for wrongful termination (including, but not limited to, retaliatory discharge claims under Chapter 451 of the Texas Labor Code); claims for sexual harassment; claims for discrimination (including, but not limited to, claims based on race, sex, religion, national origin, age, medical condition or disability); claims for benefits under the Plan or any other employee benefit program sponsored by AFC (after exhausting administrative remedies under the terms of such plans); claims for a violation of any other federal, state or other governmental law, statute, regulation or ordinance; and any and all claims challenging the validity or enforceability of this Agreement (in whole or in part) or challenging the applicability of this Agreement to a particular dispute or claim.

**CLAIMS NOT SUBJECT TO ARBITRATION:** The following matters are expressly not covered by this Agreement: (1) any criminal complaint or proceedings, and (2) claims for restitution from Employee for a criminal act for which Employee has been found guilty or has pleaded guilty or no contest or nolo contendere. Employee understands and agrees that neither Employee nor AFC has to submit items (1) and (2) above to arbitration under this Agreement and may seek and obtain relief from a court.

**REQUIRED NOTICE OF ALL CLAIMS:** AFC and Employee agree that the party seeking arbitration must give written notice of any claim to the other party within the applicable statute of limitations. Written notice to AFC or its subsidiaries, affiliates, officers, directors, shareholders, employees, agents, benefit program or fiduciaries, will be sent to AFC Enterprises, Inc., c/o Prentice-Hall Corporation, 800 Brazos, Austin, Texas 78701 (or such other person or address as AFC may specify). If AFC wishes to invoke arbitration, it will give written notice to Employee at the last address recorded in Employee's personnel file. This notice shall be sent to the other party by certified, return receipt requested. Neither filing nor serving a lawsuit stops the applicable statute of limitations from continuing to run.

**INCORPORATION OF ARBITRATION PROCEDURES:** The Arbitration Procedures set forth in the Summary Plan Description are incorporated by reference into, and made part of, this Agreement the same as if they were set forth in this

© 1999 AFC Enterprises, Inc.                    White - Employee Info Service-San Antonio
                                                Canary - Employee

Agreement at length and in full. This Agreement, together with the incorporated Arbitration Procedures set forth in the Summary Plan Description, is the complete agreement of the parties on the subject of arbitration of disputes. This Agreement takes the place of any other verbal or written understanding on this subject. If any provision of this Agreement is determined to be void or otherwise unenforceable, in whole or in part, such determination shall not affect the validity of the remainder of the Agreement.

**REPRESENTATION:** Any party may be represented during pre-hearing procedures (as defined in the Summary Plan Description) or at the arbitration hearing by an attorney or other representative selected by the party. If Employee does not participate in the arbitration hearing with an attorney, AFC will also participate in such hearing without an attorney.

**NONBINDING DISPUTE RESOLUTION:** AFC and Employee agree that the arbitration procedures described in this Agreement and in the Summary Plan Description shall not be invoked unless the party seeking arbitration has first utilized the other steps available under the Employee Handbook. The cost of any mediation conducted under the Employee Handbook shall be split evenly between the two sides to the dispute.

**RATIFICATION BY RECEIPT OF PLAN BENEFITS:** Employee agrees that each and every time that Employee receives Plan benefits, or has Plan benefits paid to a medical provider on his or her behalf, Employee ratifies and reaffirms this Agreement the same as if Employee had signed this Agreement again on the date the benefits were paid.

**NOT AN EMPLOYMENT AGREEMENT:** Neither this Agreement, the Plan nor the Summary Plan Description shall be construed to create any contract of employment, express or implied. Nor does this Agreement, the Plan or the Summary Plan Description in any way alter the at-will status of the Employee's employment with AFC

**VOLUNTARY AGREEMENT:** EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE UNDERSTANDS ITS TERMS AND IS AWARE OF THE CONSEQUENCES OF SIGNING THIS AGREEMENT, AND THAT EMPLOYEE HAS ENTERED INTO THIS AGREEMENT VOLUNTARILY AND WITHOUT DURESS, PRESSURE OR COERCION FROM ANY PERSON AND WITHOUT RELYING ON ANY STATEMENTS, ORAL OR WRITTEN, ON THE SUBJECT, EFFECT, ENFORCEABILITY OR MEANING OF THIS AGREEMENT EXCEPT AS STATED IN THIS AGREEMENT ITSELF. EMPLOYEE ACKNOWLEDGES AND REPRESENTS THAT EMPLOYEE IS NOT UNDER THE INFLUENCE OF ALCOHOL OR ANY OTHER IMPAIRING SUBSTANCE NOR UNDER ANY MENTAL INCAPACITY THAT WOULD AFFECT EMPLOYEE AT THE TIME OF SIGNING THIS AGREEMENT.

*You cannot begin work until this agreement is signed and returned. Have your parent or guardian also sign if you are under age 18 and unmarried.*

X _Jesus Ramirez_ _____
Employee's Signature

X _Jesus Ramirez_ _____     _4-4-00_
Print Employee Name                        Date

X _____
Signature of Parent or Guardian if Employee
Under Age 18 and Unmarried

X _____     _____
Print Parent or Guardian's Name and          Date
Relationship to Employee

YOU MUST COMPLETE
THE FOLLOWING:

Brand _1142_

Area _1140_

Restaurant # _1296_

Emp. Social Security
Number _462-47-330_

© 1999 AFC Enterprises, Inc.

*240 F.3d 1074; 2000 U.S. App. LEXIS 33039, ***

**Strawn** v. AFC Enterprises Inc

99-41384

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

240 F.3d 1074; 2000 U.S. App. LEXIS 33039

November 29, 2000, Decided

**NOTICE: [*1]** DECISION WITHOUT PUBLISHED OPINION

**PRIOR HISTORY:** United States District Court for the Southern District of Texas. G-99-CV-241.

**OPINION:** Vacated

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2001 LEXIS-NEXIS Group. All rights reserved.

EXHIBIT "B"

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 99-41384

---

U.S. COURT OF APPEALS
FILED

NOV 29 2000

CHARLES R. FULBRUGE III
CLERK

BARBARA STRAWN,

Plaintiff-Appellee,

versus

AFC ENTERPRISES INC.,
doing business as Churchs Chicken,

Defendant-Appellant.

- - - - - - - - -

Appeal from the United States District Court
for the Southern District of Texas
G-99-CV-241

- - - - - - - - -

Before REAVLEY, BENAVIDES and DENNIS, Circuit Judges.

PER CURIAM:

The instant appeal is from the denial of a motion to compel arbitration. Concluding that the district court erred in reaching the issue of arbitrability, we vacate the district court's order and remand with instructions to refer the case to arbitration and stay the proceedings pending arbitration.

I.    FACTUAL AND PROCEDURAL HISTORY

This diversity case arose when plaintiff Barbara Strawn was injured in a slip and fall accident within the course and scope of

---

Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

her employment at defendant AFC's Churchs Chicken Restaurant (AFC) in Alvin, Texas. AFC is a non-subscriber to the Texas Workers' Compensation Act (TWCA). Instead, AFC provides its employees defined injury benefits on a no-fault basis in exchange for their agreement to arbitrate any work-related dispute. Signing that agreement was a "condition precedent" for Strawn's employment with AFC, which began in 1997. The agreement does not waive or limit the causes of action, remedies, or damages that may be pursued in the arbitration proceeding. Additionally, AFC, as an employer that does not subscribe to the TWCA, cannot assert the defenses of contributory negligence, assumption of risk, or negligence of a fellow employee when an employee attempts to recover damages for personal injuries or death.[1] *See Cupit v. Walts*, 90 F.3d 107, 109 (5th Cir. 1996) (citing § 406.033 of the TWCA).

Some sixteen months after Strawn commenced working for AFC, she was injured at work and then began to receive benefit payments from the AFC plan. When her AFC benefits were nearing exhaustion, Strawn brought a negligence suit against AFC in Texas state court.[2] AFC removed to federal court based on diversity jurisdiction.

AFC moved to stay, or to dismiss, and compel arbitration. The district court denied the motion, stating that "where employers

---

[1] The TWCA discourages employers from choosing non-subscriber status by abolishing all the traditional common law defenses.

[2] As of August 1999, the AFC plan had paid Strawn $22,459 in wage-replacement benefits and $24,246.78 in medical benefits.

2

offer minimal benefits and unilaterally impose an arbitral forum on their injured employees, such a forum is sufficiently dissimilar to a judicial forum as to undermine Texas public policy with respect to the workers' compensation system." *Strawn v. AFC Enterprises*, 70 F. Supp. 2d 717, 725-26 (S.D. Tex. 1999). Thus, the district court concluded that AFC's plan was void as against Texas public policy.

AFC filed an interlocutory appeal from the district court's denial of its motion to compel and moved to stay proceedings pending appeal. The district court granted the motion to stay. AFC now argues that the district court's order denying its motion to compel arbitration should be reversed and remanded with instructions to send all Strawn's claims to binding arbitration and stay all proceedings pending arbitration.

II. ANALYSIS

AFC contends that the district court erred when it adjudicated Strawn's state-law public policy attack on AFC's arbitration agreement and benefit plan. Instead, AFC argues, the district court should have referred the claim to arbitration in the first instance. This Court reviews the denial of a motion to compel arbitration *de novo*. *Snap-On Tools Corp. v. Mason,* 18 F.3d 1261 (5th Cir. 1994).

The Supreme Court has made clear that the Federal Arbitration Act "establishes that, as a matter of federal law, any doubts

concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction,* 460 U.S. 1, 25-26, 103 S.Ct. 927, 941 (1983). When determining a motion to compel arbitration under the Federal Arbitration Act, courts usually conduct a two-step inquiry. *Webb v. Investacorp, Inc.,* 89 F.3d 252, 257-58 (5th Cir. 1996). The first step is to decide whether the parties agreed to arbitrate the dispute at issue. *Id.* at 258. This decision involves two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute is within the scope of that arbitration agreement. *Id.* In making this decision, "courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *Id.* (citation and internal quotation marks omitted). "In applying state law, however, 'due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration.'" *Id.* Once a court determines that the parties agreed to arbitrate, the second step is "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 3355

4

(1985)).

With respect to the first step of the *Webb* analysis, Strawn apparently recognizes that the dispute falls within the arbitration provision as written; however, she contends that the agreement was not valid.

As a threshold issue, AFC, relying on the Supreme Court's decision in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, contends that the district court erred by not referring to arbitration the *arbitrability* of Strawn's state-law public policy attack on AFC's arbitration agreement and benefit plan. 388 U.S. 395, 87 S.Ct. 1801 (1967). In *Prima Paint*, the Supreme Court addressed the question whether arbitration or the federal district court was the proper forum in which to resolve a claim of fraud in the inducement under a contract that included an arbitration provision. The Court pointed out that 9 U.S.C. § 4 directs a federal court to order arbitration to proceed if satisfied that "the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue." The Court explained that "if the claim is fraud in the inducement of the arbitration clause itself--an issue which goes to the 'making' of the agreement to arbitrate--the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally." *Prima Paint*, 388 U.S. at 403-04, 87 S.Ct. at 1806. The Supreme

Court thus held that a federal district court may consider only issues relating to the making and performance of the agreement to arbitrate.  *Id.*  The arbitrator was to resolve any other claims.

Restated, the rule enunciated in *Prima Paint* is that if the complaint relates only to the arbitration clause itself, the court should adjudicate the claim.  If, however, the complaint relates to the entire agreement, then it must be referred to the arbitrator for decision.

Our opinion in *Lawrence v. Comprehensive Business Serv. Co.*, provides some guidance with respect to this issue.  833 F.2d 1159 (5th Cir. 1987).  In *Lawrence*, the plaintiffs argued that the agreement violated the Texas Public Accountancy Act of 1979 and that ordering arbitration pursuant to an arbitration clause in an illegal contract was improper.  Applying the rule in *Prima Paint*, we rejected that argument, explaining that previously we had applied *Prima Paint* to enforce an arbitration clause in spite of a claim that the gas sales contract containing it was void from its inception because of the parties' failure to comply with a state statute regulating the sale of the state's gas.  833 F.2d at 1162 (discussing *Mesa Oper. Limited Partnership v. Louisiana Intrastate Gas Corp.*, 797 F.2d 238, 244 (5th Cir. 1986).[3]

---

[3]  In *Bhatia v. Johnston*, 818 F.2d 418, 421 (5th Cir. 1987), this Court held that an investor's claim that a contract was invalid must be referred to arbitration because the investor's complaint alleged misrepresentations with respect to the entire contract, not just the arbitration clause.

The plaintiffs in *Lawrence* also argued that enforcing the arbitration provision of an illegal contract would contravene Texas law and is thus improper. We likewise rejected this argument, explaining that the "argument forgets that the arbitrability of an issue under the Federal Arbitration Act is a matter of federal law." *Lawrence*, 833 F.2d at 1162. *See also Perry v. Thomas*, 482 U.S. 482, 492 n.9, 107 S.Ct. 2520, 2527 n.9 (1987) (courts may not "rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot").

In the instant case, Strawn's complaint relates to the entire agreement. Indeed, the district court explicitly understood Strawn "to be arguing that the combination of a unilaterally imposed arbitration agreement with a benefit plan significantly inferior to that available under the Workers' Compensation Act is void as against Texas public policy." *Strawn*, 70 F. Supp. 2d at 722.

Although the district court acknowledged the holding in *Prima Paint*, it concluded that the holding applied only to step one of the previously-cited *Webb* analysis, not step two. The district court believed the rule in *Prima Paint* was not implicated in this case because its own "analysis turn[ed] on the second step of the *Webb* inquiry." *Strawn*, 70 F. Supp. 2d at 727. In Strawn's appellate brief, however, she admits that she challenges the "AFC

7

arbitration demand under both Step 1 and Step 2 [of the *Webb*] analysis[.]" More importantly, regardless of whether the district court's analysis turns on the second step, we are constrained to apply the Supreme Court's rule in *Prima Paint* when determining the threshold issue of arbitrability.

The district court, in the alternative, stated that if the rule in *Prima Paint* did apply, it construed Strawn to be attacking the arbitration agreement in isolation. We are not persuaded. As previously stated, it is clear that Strawn's complaint related to the entire agreement--both the benefit plan and the arbitration agreement.

Standing alone, neither the benefit plan nor the arbitration clause violate Texas law or public policy. AFC is not required to participate in the statutory workers' compensation plan. *Cupit*, 90 F.3d at 109. Participation is voluntary in that an employer may refrain from becoming a subscriber under the TWCA. *Id*. With respect to the arbitration clause itself, Strawn was not required to limit or waive any cause of action; she simply was required to bring any claims to arbitration rather than to court. As such, the only possible claim Strawn has is that the *entire* agreement, *i.e.*, the combination of the benefit plan and the arbitration agreement, violate Texas public policy.

Under these circumstances, the district court erred in determining the issue of arbitrability. Instead, pursuant to *Prima*

*Paint,* the district court should have referred Strawn's claim to arbitration. Accordingly, the district court's order denying the motion to compel is vacated and remanded with instructions to refer the case to arbitration and stay the proceedings pending arbitration.

VACATED AND REMANDED

Judge Dennis concurs in the judgment only.

9

United States District Court
Southern District of Texas
FILED

FEB 2 6 2001

Michael N. Milby, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

United States District Court
Southern District of Texas
ENTERED

MAR - 6 2001

Michael N. Milby, Clerk

JUAN HINOJOSA,

   Plaintiff,

v.

AFC ENTERPRISES, INC. d/b/a
CHURCHS CHICKEN,

   Defendant.

§
§
§
§
§
§
§
§
§
§

Civil Action No. L- 00 - 60

## ORDER OF DISMISSAL

Defendant has filed a Motion to Compel Arbitration pursuant to the Federal Arbitration Act and to Dismiss Plaintiff's case. Title 9 U.S.C. §§ 1, et. seq. Because this Court finds the dispute between Plaintiff and Defendant to be within the scope of the parties' valid arbitration agreement, Defendant's Motion is GRANTED and Plaintiff's case is DISMISSED without prejudice.

*A. Facts*

Plaintiff Juan Hinojosa is a former employee of America's Favorite Chicken Company Enterprises (AFC) and has brought suit against Defendant based on injuries he sustained while working at one of Defendant's Churchs Chicken restaurants in Laredo, Texas on May 2, 1998. AFC does not subscribe to the Texas Workers' Compensation Act but has created an alternate plan by which it provides medical, wage-replacement, and death benefits to its Texas employees who are injured or killed in the course and scope of their employment. This plan is called the America's Favorite Chicken Company Texas Employee Injury Benefit Plan (the AFC Plan) and requires AFC employees to sign a contract — called the Value Deal agreement — in order to receive its benefits.

1

In the Value Deal agreement, employees waive their right to sue AFC in a judicial forum before a jury and, instead, submit themselves to binding arbitration of any claims arising from employment related injuries.

Plaintiff joined the AFC Plan and signed the Value Deal agreement on June 16, 1995. Under the Plan, AFC has paid Plaintiff $911.64 in wage-replacement benefits and $3862.73 in medical benefits for injuries he sustained on May 2, 1998. Plaintiff found these benefits to be insufficient compensation for his injuries and brought suit for damages in state court. The case was subsequently removed to federal court pursuant to Title 28 U.S.C. §§ 1441 and 1332.

*B. Analysis*

Neither party contests that Plaintiff had joined the AFC Plan and entered into the Value Deal agreement prior to sustaining the injuries at issue in this case. The parties further agree that the Value Deal agreement contains a binding arbitration clause which covers claims based on employment related injuries such as those alleged by Plaintiff in the instant case. Plaintiff does argue, however, that the AFC Plan in conjunction with the Value Deal agreement's binding arbitration provision is void as against public policy and, therefore, unenforceable. For that reason, Plaintiff urges this Court to adjudicate the merits of his claim without ordering arbitration.

Defendant counters that Plaintiff's public policy attack on the AFC Plan should itself be subject to the arbitration provision of the Value Deal agreement and has moved to compel arbitration of that issue. In deciding whether to compel arbitration under the FAA, courts conduct a two-step inquiry. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 257-58 (5th Cir. 1996). First, the court must decide whether the parties agreed to arbitrate the dispute at issue. *See id.* This decision involves two considerations: 1) whether the parties entered into a valid agreement to arbitrate; and 2) whether

2

the dispute is within the scope of that arbitration agreement. *See id.* Second, the court must decide "'whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 623 (1985)).[1]

In the instant case, Plaintiff does not dispute the existence of the agreement to arbitrate but argues that the validity of the contract is not within the scope of the arbitration clause. Plaintiff relies heavily on the district court's opinion in *Strawn v. AFC Enterprises, Inc.*, 70 F. Supp. 2d 717, 723 (S.D. Tex. 1999) which held that the same AFC Plan at issue in the instant case "work[ing] in tandem" with the same Value Deal agreement as in this case was void as against public policy. This decision was vacated, however, in an unpublished Fifth Circuit opinion. *See Strawn v. AFC Enterprises, Inc.*, No. 99-41384 (5th Cir. Nov. 29, 2000).[2] There, the Court held that the district court had erred in deciding the issue of arbitrability because it should have adjudicated only those issues "relating to the making and performance of the agreement to arbitrate." *Id.*

The Fifth Circuit recognized that the Federal Arbitration Act (FAA) contains a policy favoring arbitration such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 25-26 (1983)). Further, only when "the complaint relates only to the arbitration clause itself," should the court adjudicate the claim. *Id.* (citing *Prima Paint Corp.*

---

[1] This second step is not at issue because Plaintiff has not alleged any violation of a "federal statute or policy render[ing] the claim[] nonarbitrable." *R.M. Perez & Associates, Inc. v. Welch*, 960 F.2d 534, 538 (5th Cir. 1992).

[2] This Court recognizes that the Fifth Circuit's ruling in *Strawn* was not published and not intended as precedent, however, we find it controlling because it dealt with the arbitrability of a similar public policy challenge to a set of contracts identical to those at issue in this case. Moreover, Plaintiff's substantial reliance on the district court's opinion requires reference to the fate of that opinion on appeal.

MAR-06-2001 THU 05:53 PM          FAX NO.                    P. 05

*v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967)). In the instant case, Plaintiff is attacking the validity of both the AFC Plan and the arbitration clause of the Value Deal agreement.[3] This Court must, therefore, send Plaintiff's public policy claim to arbitration for adjudication.

### C. Defendant's Motion to Strike Plaintiff's Response and Affidavit

Defendant has also filed a Motion to Strike Plaintiff's Response in Opposition to the Defendant's Motion to Compel Arbitration and Plaintiff's Affidavit and for Leave File Defendant's Reply on November 1, 2000. Because this Court has decided to grant Defendant's Motion to Compel Arbitration and Dismiss Plaintiff's case, this Motion is hereby DENIED as moot.

Defendant's Motion to Compel Arbitration is hereby GRANTED and the case is DISMISSED without prejudice.

IT IS SO ORDERED.

SIGNED this _21st_ day of February, 2001.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**To insure full notice, each party who receives this notice shall forward a copy of it to every other party and affected non-party even though they may have been sent one by the Court.**

---

[3] Plaintiff's Response in Opposition to Defendant's Motion to Compel Arbitration and to Dismiss addresses Texas public policy concerns with both the AFC Plan and the Value Deal agreement. Even if Plaintiff's Response could be construed as an attack solely on the arbitration provision in the Value Deal agreement, however, the Fifth Circuit explicitly rejected the merits of such an attack in *Strawn v. AFC Enterprises, Inc.*, No. 99-41384 (5th Cir. Nov. 29, 2000). That Court held that "[s]tanding alone, neither the benefit plan nor the arbitration clause violate Texas law or public policy" and that "the only possible claim [plaintiff] has is that the *entire* agreement, i.e., the combination of the benefit plan and the arbitration agreement, violate [sic] Texas public policy." *Id.*

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

JESUS RAMIREZ,                    §
                                  §
        Plaintiff,                §
                                  §
v.                                §    Civil Action No. _____
                                  §
AFC ENTERPRISES, INC.,            §
                                  §
        Defendant.                §

## ORDER TO COMPEL ARBITRATION

CAME ON for consideration this day Defendant's Motion to Dismiss in the above-referenced matter in which Defendant requested, in the alternative, that the Court stay the case to compel arbitration pursuant to the parties' prior agreement. The Court, after reviewing the Motion and evidence, finds that Defendant's Motion is well taken and should be granted in the alternative.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that within 60 days from the date of this Order, the parties proceed to binding arbitration before the American Arbitration Association in accordance with the parties' pre-existing arbitration agreement.

IT IS FURTHER ORDERED that any and all further proceedings in this lawsuit are hereby stayed pending further order of the Court.

IT IS FURTHER ORDERED that counsel for the parties are directed to submit a written report to the Court upon the completion of their arbitration proceeding before the American Arbitration Association or upon the resolution of the parties' claims by any other means.

IT IS FURTHER ORDERED that this case is administratively closed for statistical purposes without prejudice to its being reopened to enter an order of dismissal and/or an order regarding any arbitration award rendered by the American Arbitration Association arbitrator.

**Order to Compel Arbitration - Page 1**

IT IS FURTHER ORDERED that in any such further order of this Court costs of court shall be assessed against the party who incurred them, unless otherwise reallocated by the arbitrator or agreement of the parties.

SIGNED this _____ day of _____, 200___.


_____
UNITED STATES DISTRICT JUDGE

**Order to Compel Arbitration - Page 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JESUS RAMIREZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. _____ |
| | § | |
| AFC ENTERPRISES, INC., | § | |
| | § | |
| Defendant. | § | |

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

CAME ON for consideration this day Defendant's Motion to Dismiss in the above-referenced matter. The Court, after reviewing the Motion and evidence, finds that Defendant's Motion is well taken and should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that this lawsuit be dismissed to permit the parties to proceed to binding arbitration before the American Arbitration Association in accordance with the parties' pre-existing arbitration agreement.

SIGNED this _____ day of _____, 200___.

_____
UNITED STATES DISTRICT JUDGE

**Order Granting Defendant's Motion to Dismiss - Page solo**

/5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
ENTERED

MAY 15 2002

Michael N. Milby, Clerk of Court
By Deputy Clerk

JESUS RAMIREZ,        §
        Plaintiff,     §
                       §
                       §      C.A. B-01-214
v.                     §
                       §
AFC ENTERPRISES, INC., §
        Defendant.     §

ORDER

BE IT REMEMBERED that on May 13, 2002, the Court **GRANTED** Defendant's

Motion to Dismiss [Dkt. No. 2] without prejudice to refile.

DONE this 14th day of May, 2002 at Brownsville, Texas.

Hilda G. Tagle
United States District Judge